Hillsborough
No. 90-577

THE STATE OF NEW HAMPSHIRE

v.

PETER DUSHAME

November 4, 1992

*John P. Arnold*, attorney general (*Peter G. Beeson*, associate attorney general, and *Anne E. Renner*, assistant attorney general, on the brief, and *Mr. Beeson*, orally), for the State.

*James E. Duggan*, chief appellate defender, of Concord, by brief and orally, for the defendant.

PER CURIAM. The defendant, Peter Dushame, was found guilty after a jury trial in Superior Court (*Dalianis*, J.) of manslaughter,

RSA 630:2; negligent homicide caused by intoxication, RSA 630:3; simple assault, RSA 631:2-a; and driving after revocation, RSA 263:64. He was sentenced to serve fifteen to thirty years in the New Hampshire State Prison. On appeal, the defendant raises three issues: (1) whether the trial court, by substituting an alternate juror for a disqualified juror after jury deliberations had begun in the case, violated RSA 500-A:13; (2) whether the trial court erred by admitting into evidence under New Hampshire Rule of Evidence 404(b) the complaints, records of conviction and notices of revocation resulting from the defendant's four prior DWI convictions for the purpose of showing that the defendant "recklessly" caused the death of Lacey Packer; and (3) whether the trial court abused its discretion by not allowing a defense expert to testify fully as to the basis of his opinion. We reverse.

Ten-year-old Lacey Packer died on October 3, 1989, as a result of head injuries received when she was struck by a car two days before. She had been a passenger on her father's motorcycle as they returned home to Massachusetts from a charity motorcycle run in Merrimack, New Hampshire. They were accompanied by two friends, Brian and Denise Rhodes, who were also riding a motorcycle. As they approached the Massachusetts border on the return trip, both motorcycles pulled into the breakdown lane of the Everett Turnpike just south of the Exit 1 southbound on-ramp so that the adults could put on helmets. Lacey was already wearing one.

Shortly afterwards, Brian Rhodes saw a car approaching from the on-ramp traveling in the breakdown lane at high speed. Despite his frantic waving, the car did not reduce its speed or steer onto the roadway. Instead, the driver waved back. Immediately before impact, Brian Rhodes grabbed his wife and leapt to safety over the guardrail; Lacey's father, unaware of the approaching car, was thrown over the guardrail upon impact and suffered leg injuries; Lacey was hit from behind as she sat on her father's motorcycle.

The defendant was the driver of the car. Shortly after the accident, the police arrived and the defendant attempted to flee. A police officer ordered the defendant to stop. He complied, and soon after the officer performed a field sobriety test. The defendant failed. He was arrested and taken to the Nashua Police Department, where the police administered a blood alcohol test. The test results showed a .33 blood alcohol content which, according to evidence offered by the State, roughly translates to eighteen alcoholic drinks consumed between the time the defendant was first observed drinking that after-

noon and the time the test was administered, nearly eighty minutes after the crash.

Prior to trial, the State moved to be permitted to introduce evidence of the defendant's five prior DWI convictions for the purpose of showing recklessness. With the exception of the defendant's earliest DWI arrest in 1981, the trial court granted the State's motion to admit the evidence. After a subsequent defense motion to suppress, the court limited the admissible evidence to certified copies of the complaints, records of conviction and formal notices of license revocation, thereby excluding from evidence the facts underlying the convictions. On the seventh day of the fourteen-day trial, the State presented the evidence of the DWI convictions to the jury.

## I. Substitution of an Alternate Juror

We first consider whether the trial court erred by substituting an alternate juror after deliberations had begun. The evidence shows that the court impanelled fifteen jurors. After trial and at the conclusion of its charge, the court designated three alternates. The trial court instructed them to remain "available" during the course of deliberations and informed the alternates and counsel of its intention to make a substitution in the event that a juror became disabled during the course of deliberations. The defendant did not object to the court's decision to retain the alternates, but reserved the right to object if the court made a substitution during deliberations. Upon the defendant's request, the court instructed the alternates to continue adhering to the media rules.

The jury began deliberations at 9:25 a.m. the following morning and recessed for lunch at 12:25 p.m. Shortly after lunch, the forewoman told the judge that the previous weekend she had inadvertently learned that the defendant was incarcerated. The court suspended deliberations and excused the jury for the day in order to give the court and counsel an opportunity to consider the issue of whether the forewoman could be replaced by an alternate.

On the following morning, after a brief *voir dire* of the forewoman, the court concluded that she was disqualified from continuing, but that she had not tainted the jury by sharing the information. The defendant requested an opportunity to make an independent inquiry to assess the impact of her presence upon the deliberations up until that time. The court denied the request, and over the defendant's objection, recalled an alternate. After a brief line of questioning, the court found that the alternate had not been exposed to media coverage or outside influence concerning the case and that she was qualified to serve on the jury.

The remaining eleven jurors were called into open court and told that the forewoman had become disabled and that an alternate would be added to the panel. The court randomly selected a new foreperson. Before reconvening deliberations, the court issued instructions to ensure that the deliberations with the alternate started again from "square one." The instructions admonished the jury to disregard any opinions previously offered by the disabled forewoman, to disregard any direction their deliberation may have taken, and to disregard any preliminary opinions that they may already have formed.

In order to minimize the disruption and to reduce the potential embarrassment of jurors wishing to withdraw from service, the court gave the jurors a period of time to consider individually, without debating as a group, whether they were able to comply with the instructions. The jurors were instructed to give an answer to the court privately through the court bailiff. None expressed doubt concerning their ability to continue serving and the court instructed the jury to reconvene deliberations. After nearly a day and a half of deliberations the jury returned a guilty verdict on the four counts of manslaughter, negligent homicide, simple assault, and driving after revocation.

Whether the trial court erred by substituting the alternate juror during deliberations involves the application of RSA 500-A:13, which governs the selection, discharge, and impanelling of alternate jurors. The defendant argues that the trial court's decision to substitute an alternate for the disabled juror after the deliberations had begun violates the statute and should have resulted in a mistrial. The State argues that RSA 500-A:13 should be construed to allow the superior court to substitute alternates for jurors who become disabled during the course of deliberations.

■ "To determine the meaning of a statute, we first look to see if the language used is clear and unambiguous." *N.E. Brickmaster v. Town of Salem*, 133 N.H. 655, 658, 582 A.2d 601, 602 (1990). RSA 500-A:13, IV provides in part:

> "If, *before the final submission of the case to the jury*, one or more jurors becomes incapacitated, is disqualified or dies, his place shall be taken, upon the order of the court, by an alternate juror who shall become one of the jury and serve in all respects as if selected as an original juror."

(Emphasis added.)

This language is not vague or uncertain. The legislature has clearly stated its intent that courts be allowed to substitute alternate

jurors for one or more of the original twelve jurors who might become disabled *before* the jury begins deliberations. Although acknowledging the clear language permitting pre-submission substitution, the State argues that RSA 500-A:13 does not explicitly prohibit substitution when a juror becomes disabled after submission.

■■ The State's basic premise, that the statute does not consider post-submission substitution, is questionable at best. RSA 500-A:13, III states that, if alternate jurors are not substituted under section IV, they "*shall* be *discharged* upon final submission of the case to the jury." (Emphasis added.) We doubt that the legislature *implicitly* envisioned post-submission substitution while at the same time *explicitly* mandating courts to dismiss alternate jurors immediately after submission of the case to the jury. *See United States v. Hayutin,* 398 F.2d 944, 950 (2d Cir.) (no purpose in retaining jurors given legislative failure to provide procedure for substitutions after deliberations), *cert. denied,* 393 U.S. 961 (1968). Taking liberty with legislative silence by fashioning judicial rules in its stead is contrary to well-settled rules of statutory construction. We have consistently held that "the words in the statute itself are the touchstone of the legislature's intention," *Greenhalge v. Town of Dunbarton,* 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982), and that "legislative intent is to be found not in what the legislature might have intended, but rather, in the meaning of what it did say." *Psychiatric Institute v. Mediplex, Inc.,* 130 N.H. 125, 128, 536 A.2d 169, 171 (1987); *see also State v. Lehman,* 108 Wis. 2d 291, 305–06, 321 N.W.2d 212, 219–20 (1982) (refusing to infer from silent statute that legislature approves post-submission substitution). The State essentially asks us to modify RSA 500-A:13 to allow late substitution. But, "[a]s we have previously noted, [w]hen the language used in a statute is clear and unambiguous, its meaning is not subject to modification by judicial construction." *Slovenski v. State,* 132 N.H. 18, 22, 561 A.2d 1072, 1075 (1989) (quotations omitted).

■ RSA 500-A:13 clearly mandates that alternate jurors "*shall* be *discharged* upon final submission of the case to the jury." (Emphasis added.) As the final arbiter of legislative intent, *Dionne v. City of Manchester,* 134 N.H. 225, 227, 589 A.2d 1016, 1017 (1991), we hold that RSA 500-A:13 does not permit the trial court to retain or recall alternate jurors and reconstitute the jury during the course of deliberations. The conclusion, then, is inescapable that the trial court's decision to substitute an alternate juror for the disqualified foreperson constituted a clear statutory violation.

■ While it has been stated in other contexts that relief is not afforded a criminal defendant based on a statutory violation absent a showing of prejudice, *State v. Reynolds*, 131 N.H. 291, 295, 556 A.2d 298, 300 (1988), RSA 500-A:13 touches upon the integrity of the deliberative process of the jury and therefore requires special consideration. The New Hampshire Constitution mandates that a jury of twelve must unanimously reach a verdict of guilty before a defendant's liberty may be compromised. *See State v. Hewitt*, 128 N.H. 557, 561, 517 A.2d 820, 822 (1986) (State Constitution affords accused right to jury of twelve, and "twelve means twelve"). As stated, RSA 500-A:13 mandates that upon the submission of the case to the jury the alternates "shall be discharged"; in short, they are no longer alternate members of the jury panel. Once discharged from the jury panel a juror cannot be recalled by the trial court. In this case, a jury of only eleven qualified jurors decided the defendant's fate. This is in direct violation of our State constitutional mandate. When the forewoman became disqualified, the trial court had just two options available to it: first, to obtain a stipulation by the parties to proceed with fewer than twelve jurors; or second, to declare a mistrial. Because the trial court followed neither of these options, the jury's verdict cannot stand. *See* FED. R. CRIM. P. 23 advisory committee's note (criticizing post-submission substitution); 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 388, at 393 (2d ed. 1982) (same).

We recognize and commend the trial court in this case for its "extraordinary precautions," *People v. Burnette*, 775 P.2d 583, 590 (Colo. 1989), taken in an effort to ensure that the jury had not been corrupted and to restore the jury to twelve members. We do not here consider the constitutional implications of late substitution, and we express no opinion concerning possible future legislative initiatives that may be considered with respect to the use of alternates after deliberations have begun. We nevertheless decline to sanction the trial court's efforts in the face of contrary legislative direction.

*II. Use of Prior Convictions*

■ Since the issue of the submission of the defendant's prior DWI convictions will likely arise upon a retrial, we next consider the trial court's decision to admit evidence of the defendant's four prior DWI convictions for the limited purpose of showing recklessness. New Hampshire Rule of Evidence 404(b) prohibits introduction of evidence of prior bad acts or crimes in order to show "that the [defendant] acted in conformity therewith" and, therefore, was more likely to have perpetrated the crime charged. Such evidence, how-

ever, is allowed for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." N.H. R. Ev. 404(b). Whether to admit evidence under Rule 404(b) involves the consideration of three factors: first, the evidence must be relevant for a purpose other than character or disposition; second, there must be clear proof that the defendant committed the prior offenses; and third, the prejudice to the defendant must not substantially outweigh the probative value of the evidence. *State v. Gruber*, 132 N.H. 83, 88, 562 A.2d 156, 159 (1989). The third prong incorporates the standards of New Hampshire Rule of Evidence 403 requiring a showing of unfair prejudice. *State v. Trainor*, 130 N.H. 371, 375, 540 A.2d 1236, 1239 (1988). The second prong, requiring clear evidence of the prior bad acts, is not at issue in this case.

The defendant claims that the evidence of his prior DWI convictions is not relevant to prove that he acted recklessly on the day of the accident. He argues that, without underlying facts showing that his prior experiences of drinking and driving resulted in accidents and injury, any relevance the prior acts may have had to show recklessness was destroyed. The evidence of his prior DWI convictions, according to the defendant, is relevant only to show that he had an awareness that drinking and driving would lead to his arrest, conviction and punishment, or to show his propensity to drink and drive, purposes at odds with Rule 404(b). Moreover, the defendant claims that, even if the evidence were relevant to the crime charged, its probative value is substantially outweighed by its unfair prejudice to his case.

The State responds that the evidence is relevant to show that the defendant had a heightened awareness of the danger associated with DWI and that by disregarding the danger, he acted recklessly, a required element of manslaughter as charged, RSA 630:2, I(b). The State argues that by allowing only the documentary evidence of the prior convictions for DWI, the court substantially eliminated the prejudicial effect that the underlying details of the earlier DWI's might have had upon the jury. The State also argues that because recklessness was a central and contested issue, the prior bad act evidence increased in probative value.

Relevant evidence need only have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. We agree with the State that evidence of the defendant's driving record showing his past experience of re-

peated arrests, convictions and punishment for DWI may be deemed relevant to the question of whether the defendant acted recklessly when he subsequently drove his vehicle in an intoxicated condition.

■■ The issue may then be simply stated: Did the trial court abuse its discretion in admitting the defendant's previous DWI arrests and convictions? Accepting the relevancy of the driving record evidence to a permitted Rule 404(b) purpose, we must decide whether the probative value of this evidence was substantially outweighed by its prejudice. The established rule is clear: "'The trial court is accorded considerable deference in its determination of whether the prejudice substantially outweighs the probative value.'" *State v. Tarsitano*, 134 N.H. 730, 735–36, 599 A.2d 474, 477 (1991) (quoting *State v. Gruber*, 132 N.H. 83, 90, 562 A.2d 156, 160 (1989)). We have always afforded the trial court "broad discretion in ruling on the admissibility of evidence." *Fenlon v. Thayer*, 127 N.H. 702, 705, 506 A.2d 319, 321 (1986). We see no reason to depart from this well-established rule in this case.

We see no abuse of discretion by the trial court in balancing the prejudice against the probative value of the evidence of the defendant's prior DWI record. Clearly there is prejudice in all prior bad acts evidence. *Gruber supra*. If we look beyond this fact, to the character of the evidence itself, it does not appear that the prejudice is particularly overwhelming. The concurring opinion reaches a conclusion of serious prejudice only when the evidence is considered in light of the very emotional and sensitive facts of this case. The prior convictions take on a veneer of prejudice not inherent in the evidence itself. *But see State v. Allen*, 128 N.H. 390, 397, 514 A.2d 1263, 1268 (1986) (holding risk of prejudice resulting from admission of evidence "minimized" by remaining evidence).

■ On the other hand, the probative value would seem to be considerable. The State bears the burden to prove, beyond a reasonable doubt, that the defendant had a culpable state of mind. In this instance, the State alleged, and thus had to prove, that the defendant's conduct was "reckless." Consequently, the State had to prove that the defendant, subjectively, was aware of a known risk, and that he, again subjectively, knew of circumstances, the disregard of which, objectively, would be determined to be a "gross deviation from the conduct that a law-abiding person would observe in the situation." RSA 626:2, II(c). This is a difficult standard to meet, as well it should be. The unlikelihood of developing direct testimony on the defendant's state of mind calls for consideration of all proper proof that can

be proffered by the prosecution. We hold that the trial court did not abuse its discretion under the facts of this case.

*III. Expert testimony*

■ Regarding the final issue, we find that the defendant has failed to establish that the trial court abused its discretion by limiting the testimony of the defendant's expert witness. *See State v. Place*, 128 N.H. 75, 78, 513 A.2d 321, 323 (1986) (trial judge has wide discretion in admission and exclusion of opinion evidence).

*Reversed and remanded.*

BROCK, C.J., with whom BATCHELDER, J., joined, concurred in Parts I and III of the opinion, and dissented from Part II; THAYER, J., concurred in Parts II and III of the opinion, and dissented from Part I; the others concurred.

BROCK, C.J., concurring in part and dissenting in part: I dissent from the majority's decision to admit evidence of the defendant's four prior DWI convictions for the limited purpose of showing recklessness. While I concur with the majority's conclusion that such evidence is *relevant* to the issue of recklessness, a finding of relevancy, of course, does not satisfy all the requirements of Rule 404(b). "[T]he fact that there is an accepted logical basis for the evidence other than the forbidden one of showing a proclivity for criminality may not preclude the jury from relying on a defendant's apparent propensity toward criminal behavior." 1 K. BROUN ET AL., MCCORMICK ON EVIDENCE § 190, at 811 (J. Strong ed., 4th ed. 1984). Thus, I must consider whether the probative value of the evidence is substantially outweighed by unfair prejudice. At the outset, I note that the probative value of the evidence of the defendant's prior convictions, without underlying facts showing that accident or injury resulted, is minimal. That the court eliminated the underlying facts in order to reduce the prejudice at the defendant's request does not factor into my analysis.

The low probative value must be contrasted with the prejudicial effect of the evidence which remains quite high despite the court's efforts to narrow its scope and form. We have previously recognized that evidence of other crimes or prior convictions carries with it inherent prejudice. *State v. Ellison*, 135 N.H. 1, 4, 599 A.2d 477, 479 (1991); *State v. Hickey*, 129 N.H. 53, 62, 523 A.2d 60, 66 (1986); *see also State v. Woodbury*, 124 N.H. 218, 220, 469 A.2d 1302, 1304 (1983). Unfair prejudice "is an undue tendency to induce a decision

against the defendant on some improper basis . . . , commonly one that is emotionally charged." *State v. Cochran,* 132 N.H. 670, 672, 569 A.2d 756, 757 (1990). "Evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action may cause a jury to base its decision on something other than the established propositions in the case." 1 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 403[03], at 403-33 to -39 (1992). In this instance, adding evidence to an already emotional case that the defendant had on four prior occasions been convicted of alcohol related offenses heightened the risk that the jury would find that he had committed the offense for which he was on trial because he had been found guilty of alcohol related offenses in the past. The line between the prohibited use of such evidence to prove character or disposition (to commit a crime) and the use permitted by the trial court to prove recklessness is so fine as to be indiscernible. Moreover, other factors commonly used to assess the risk of misuse by the jury, particularly the need for the evidence in light of the efficacy of alternate proof, MCCORMICK *supra,* counsel against the introduction of this evidence.

The need to present evidence of the defendant's prior DWI convictions to the jury is not so high that my countervailing fears of potential misuse are overcome. "The prosecution in a criminal case (unlike in a civil trial) should establish that the proffered evidence is crucial to its case rather than merely 'gilding the lily.'" C. DOUGLAS, NEW HAMPSHIRE RULES OF EVIDENCE MANUAL 65 (1986). In the past, we have recognized that in determining the need for the evidence the trial court must examine "the exact details of the State's burden." *State v. Hickey,* 129 N.H. at 60, 523 A.2d at 65. The State argues that because it must prove reckless conduct and because the defendant's state of mind is a contested issue, the need for the evidence of the defendant's prior convictions or bad acts is high. It is true that where an issue is sharply contested, the need for such evidence may become heightened. On the other hand, when there is an abundance of other evidence relevant to the issue, the need is substantially reduced:

> "[I]f there is simply no other practical means to prove the point, then the need factor points strongly toward receipt of other crimes evidence. If, on the contrary, the point is conceded, *or strongly supported by other proof,* then the need factor points toward exclusion, and should weigh heavily, perhaps decisively, on the scales."

*United States v. Fields,* 871 F.2d 188, 198 (1st Cir.) (quotations omitted) (emphasis added), *cert. denied,* 493 U.S. 955 (1989); *cf. United*

*States v. Garcia-Rosa*, 876 F.2d 209, 221–22 (1st Cir. 1989) (unfair prejudice where incremental value of evidence minimal and other, direct proof available).

In this case, the amount and efficacy of other evidence tending to show that the defendant acted recklessly favors excluding the evidence of the defendant's prior DWI's. Among other things, the evidence showed that the defendant consumed the equivalent of nearly eighteen drinks before deciding to drive. It showed that the defendant was driving at high speed in the breakdown lane and actually passed another car on the roadway. Brian Rhodes testified that the defendant failed to take appropriate evasive action in response to his waving; instead, the defendant waved back. Mr. Rhodes' testimony is supported by the lack of any physical evidence showing that the defendant took evasive action; in fact, skid marks from hard braking did not appear until 113 feet beyond the point of impact. Finally, the State introduced evidence showing that the defendant had recently watched an alcohol awareness film explaining the danger and risk of injury associated with drinking and driving. Thus, the State was able to introduce other probative and less inflammatory evidence in order to show that the defendant acted recklessly on the day of the accident. To inject gratuitously evidence that the defendant was a chronic drunk driver was unfairly prejudicial. For these reasons, I would find that the trial court abused its discretion by admitting evidence of the defendant's prior DWI convictions.

BATCHELDER, J., joins in the opinion of BROCK, C.J.

THAYER, J., concurring in part and dissenting in part: I concur with the result reached by the majority in Part II with regard to the admissibility of the defendant's four prior DWI convictions under Rule 404(b) and in Part III regarding expert testimony. In my opinion, however, the trial court's substitution of an alternate juror after the deliberations had begun does not warrant reversal. Therefore, I respectfully dissent from Part I of the majority opinion.

In this case, twelve people, each of whom heard all of the testimony, arguments, and jury instructions, returned a unanimous verdict of guilty. Despite this fact, the majority reverses an otherwise valid verdict on the sole ground that one of those twelve jurors participated in the deliberations in violation of RSA 500-A:13, IV.

I do not disagree with the majority's conclusion that RSA 500-A:13, IV requires the trial court to dismiss alternate jurors after the case is submitted to the jury, or that the post-deliberation substitution of an alternate for an original juror should be construed to

violate the statute. In my opinion, however, the majority errs by assuming that the legislature intended that the violation of RSA 500-A:13, IV requires the *per se* reversal of the jury verdict because a juror was substituted after deliberations had begun. As the majority concedes, RSA 500-A:13, IV is silent as to the remedy that should be imposed for the trial court's failure to dismiss the alternates at the appropriate time. We should not assume by this silence that the legislature intended the automatic reversal of a criminal defendant's conviction.

To merely assume that the remedy must result in *per se* reversal of the conviction is contrary to our own case law and to the treatment of this precise issue in other jurisdictions. In *State v. Reynolds*, 131 N.H. 291, 556 A.2d 298 (1988), we considered the legal effect of the violation of a statute that, like RSA 500-A:13, IV, itself provided no remedy for its violation. In *Reynolds*, the State violated RSA 595-A:6 (current version at RSA 595-A:6 (Supp. 1991)) by returning drugs that the defendant had stolen to the pharmacy owner before trial. On appeal, the defendant argued that by returning the evidence in violation of the statute, the State violated the due process clause of the New Hampshire Constitution and that because of those violations, the evidence should have been suppressed. After determining that there was no due process violation, Chief Justice Brock, writing for the court, concluded: "The defendant is not due any relief under RSA 595-A:6, either, because there has been no showing of prejudice that would warrant this court's fashioning a remedy for violation of the statute." *Id.* at 295, 556 A.2d at 300. By not providing a sanction for violation of RSA 500-A:13, IV, the legislature intended either that none should apply or that, in accordance with *Reynolds*, the remedy should be fashioned by the courts on a case-by-case basis taking into consideration whatever prejudice the statutory violation caused the defendant. Applying the analysis in *Reynolds*, I would hold that the remedy in this case involves a showing of prejudice; the defendant's conviction should not be reversed without a showing that the post-deliberation substitution was prejudicial.

Our requirement of prejudice in *Reynolds* is not unusual, even where important constitutional rights are at stake. In *State v. Pond*, 132 N.H. 472, 567 A.2d 992 (1989), we considered whether an indictment that incorrectly alleged more than one *mens rea* was constitutionally invalid. We unanimously declined to adopt a *per se* rule entitling the defendant to an automatic new trial. *Id.* at 477, 567 A.2d at 995–96. Instead, we required a showing of prejudice. Because the defendant did not allege or argue any prejudice resulting from the

incorrect indictment, we denied his request for a new trial. *Id.* In *State v. Nadeau*, 126 N.H. 120, 124, 489 A.2d 623, 625 (1985), the defendant argued on appeal that his confession should not have been used at his trial because the prosecution did not comply with Superior Court Rule 98. Rule 98 requires that the prosecution furnish the defendant with a copy of his confession within five days after a plea of not guilty if the prosecution plans to use it against him. Although the violation of this rule involved important constitutional rights relating to confessions and the defendant's ability to prepare his defense, we discouraged the technical application of court rules, noting that Rule 98 "provides no sanction for failure to comply with its terms." *Id.* Thus, we unanimously held that the trial court has the discretion to waive the requirement of the rule if it determines that the defendant's rights were properly protected. *Id.* at 124–25, 489 A.2d at 625–26.

Other courts have also required a showing of prejudice. In a case closely on point, the Supreme Court of Colorado construed a provision of their rules of criminal procedure that, like RSA 500-A:13, IV, mandated the discharge of alternate jurors when the jury retires to deliberate, as prohibiting the substitution of an alternate for a regular juror during deliberations. *People v. Burnette*, 775 P.2d 583, 587 (Colo. 1989). The *Burnette* court then determined the legal effect of such a substitution on the jury's verdict. The court held that the recall of an alternate to replace a regular juror did not require a *per se* rule of mistrial, but instead raised a presumption of prejudice that could be overcome by a showing that the trial court used adequate procedural precautions to obviate the danger of prejudice. *Id.* at 587–88. The *Burnette* court cautioned that they did not intend to sanction a "clear deviation" from their rules of criminal procedure, but rather to acknowledge that many factual circumstances exist in which an unauthorized substitution may occur and that the presumption of prejudice may be rebutted. *Id.* at 591. The court, in fact, relied upon a harmless error analysis.

Like the *Burnette* court, I hesitate to sanction a deviation from procedural rules set forth by the legislature. When the legislature does not provide for a sanction, however, and instead relies on the courts to do so, the remedy we fashion should involve a consideration of prejudice suffered by the defendant. In some circumstances, of course, a defendant may be able to establish sufficient prejudice to require a new trial after a post-deliberation substitution, but the defendant here does not even allege that he suffered *any* prejudice. Moreover, under the facts of this case, even if we were to apply the

standard in *Burnette* and presume that the post-deliberation substitution resulted in prejudice, the record shows that the extraordinary measures Judge Dalianis used to protect the defendant's right to a jury of twelve individuals were more than sufficient to rebut such a presumption. *See State v. Fennell*, 128 N.H. 383, 384, 513 A.2d 363, 364 (1986) (trial court has broad discretion to resolve issues of possible juror prejudice at any time during course of trial); *see also State v. Brodowski*, 135 N.H. 197, 201–02, 600 A.2d 925, 927–28 (1991) (applying harmless error analysis to issue involving whether disqualified jurors sat on jury).

Before trial, the court impaneled fifteen jurors. The alternates were not chosen until after the court charged the jury, and thus all fifteen listened to the same evidence, arguments, and jury instructions. After the court randomly chose three alternates, the judge instructed the alternates to remain available throughout the deliberations and, at the request of the defendant, additionally instructed them to continue adhering to the court's instructions regarding the media. After approximately three hours of deliberations, when the court learned that the forewoman had inadvertently discovered that the defendant was incarcerated, the court immediately removed the forewoman from the jury to protect the others from any taint and sent the rest of the jurors home for that day. The next day the judge conducted an extensive *voir dire* of the discharged juror to confirm that the forewoman had not shared any information with the other jurors. The court then conducted a *voir dire* of one of the alternates in the presence of both counsel, and only after determining that the alternate had not been exposed to media coverage or any outside influence did the court substitute the alternate for the disabled juror.

After recalling the remaining eleven jurors, the court informed the reconstituted jury that the forewoman had become disabled and could not continue the deliberations. The court told them that "[h]er reasons have nothing whatever to do with the deliberations or any person in the jury. They are completely personal to her, and have no bearing at all upon what you folks have yet to do or have already done." The court then gave the following instruction:

> "The important thing here, though, to ensure the integrity of this process, is that you are able to follow a very specific instruction. You are to disregard any of the missing juror's opinions or observations or views as she may have expressed them. You are equally to disregard the tenor and direction of your conversations yesterday. You are to disre-

gard any preliminary opinions you may have reached, and you are ordered to proceed with this deliberation as though yesterday never existed. Of course, it's a little hard to erase your minds, but in essence what you have to do with your new foreperson is go right to square one. Start from the beginning, include [the alternate] in your deliberations as you proceed. . . .

[W]e're going to rely on your integrity in terms of going back and starting from scratch. If any one of you feels that you cannot do that, in other words that you have already formed an opinion that you can't change, that you don't feel you can realistically go back to the beginning, I'd like you to approach me about that through the Bailiff privately."

This instruction to begin deliberations anew is the essential element necessary to ensure that all twelve jurors fully participate in arriving at a unanimous verdict, thereby satisfying the defendant's constitutional right to a fair and impartial jury. *See, e.g., People v. Collins*, 17 Cal. 3d 687, 694, 552 P.2d 742, 746–47, 131 Cal. Rptr. 782, 786–87 (1976) (construing statute allowing juror substitution after commencement of jury deliberations); *Commonwealth v. Haywood*, 377 Mass. 755, 768–69, 388 N.E.2d 648, 656 (1979) (same). As a final precaution, the judge ordered the bailiff to collect any notes that the jurors had made during the previous morning's three hours of deliberations. The reconstituted jury then deliberated for approximately six hours over the course of two days before returning a unanimous verdict of guilty.

To set aside a unanimous verdict of twelve jurors because a statute, that itself does not require such draconian measures, was violated absent any hint of prejudice to the defendant has in my opinion no basis in our case law, *see Reynolds*, 131 N.H. 291, 556 A.2d 298; *Pond*, 132 N.H. 472, 567 A.2d 992; *Nadeau*, 126 N.H. 120, 489 A.2d 623, or in the concept of efficient administration of justice. For these reasons, I respectfully dissent.