Rockingham
No. 94-061

ROBERT MARCOTTE, ADMINISTRATOR
OF THE ESTATE OF NICHOLAS MARCOTTE

v.

TIMBERLANE/HAMPSTEAD SCHOOL DISTRICT & a.

February 9, 1999

*Devine, Millimet & Branch, P.A.*, of Manchester (*Andrew D. Dunn* on the brief and orally), for the plaintiff.

*McDonough & O'Shaughnessy, P.A.*, of Manchester (*Michael B. O'Shaughnessy* and *Cindy Robertson* on the brief, and *Mr. O'Shaughnessy* orally), for defendant Timberlane/Hampstead School District.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester (*Charles J. Dunn & a.* on the brief, and *Mr. Dunn* orally), for defendant Process Engineering, Inc.

*Bouchard & Mallory, P.A.*, of Manchester (*Blake M. Sutton* and *Robert S. Stephen* on the brief, and *Mr. Sutton* orally), for defendant Timberlane Soccer League.

*Sulloway & Hollis*, of Concord (*Martin L. Gross* and *William D. Pandolph* on the brief), for the American Insurance Association, as *amicus curiae.*

*Orr & Reno, P.A.*, of Concord (*Cordell A. Johnston & a.* on the brief), for The Hitchcock Clinic and New Hampshire Medical Malpractice Joint Underwriters Association, as *amici curiae.*

*Nixon, Hall & Hess, P.A.*, of Manchester (*Kathryn B. Johnston* on the brief), for the New Hampshire Trial Lawyers Association, as *amicus curiae.*

HORTON, J. Following trial of a wrongful death action, *see* RSA 556:12 (1997) (amended 1997, 1998), the jury awarded $925,000 to the plaintiff, Robert Marcotte as administrator of the estate of Nicholas Marcotte. On appeal, the plaintiff argues that the Superior Court (*Fauver*, J.) erred in abating the verdict against defendant Timberlane/Hampstead School District (school district) to $150,000. *See* RSA 507-B:4 (1997). On cross-appeal, the defendants, Timberlane Soccer League (soccer league) and the school district,

contend that the superior court erred: (1) in permitting the plaintiff to introduce evidence of loss of life, also known as hedonic damages; (2) instructing the jury that it may consider loss of life as an element of damages; (3) in admitting certain evidence, including computer diary entries and photographs of the decedent, his belongings, and the accident scene; and (4) in refusing to set aside the verdict as excessive. In addition, the soccer league argues that the trial court erred in failing to provide various requested jury instructions. We reverse the abatement of the verdict against the school district and affirm the remaining rulings.

A representative of the soccer league designed a set of soccer goals by modifying a design found in a goal manufacturer's publication. In manufacturing the goals, Process Engineering, Inc. (Process Engineering) made additional design modifications furnished by the soccer league. In 1985, the soccer league donated the 310-pound steel goals to the school district, assembling and installing them on the school district's grounds. The soccer goals were apparently used without incident until March 1989, when one of the goals at the Pollard School in the defendant school district tipped over, injuring a student.

Another Pollard School student was injured in an accident involving one of the goals in August 1989.

On September 27, 1989, during recess at the Pollard School, Nicholas Marcotte died from injuries sustained when a fellow second-grade student tipped over one of the unanchored goals, striking Nicholas in the head. The plaintiff commenced a wrongful death action alleging: (1) that the soccer league and Process Engineering were negligent in the design, fabrication, testing, and installation of the soccer goal; and (2) that the school district was negligent in failing to maintain its grounds in a safe and reasonable condition when it knew or should have known of the dangerous nature of the soccer goal.

Prior to trial, the trial court denied the defendants' motion to exclude evidence of damages for loss of life. At trial, the plaintiff introduced the decedent's computerized diary and photographs of the decedent and his belongings. The plaintiff also introduced photographs of the accident scene. The jury found the defendants jointly and severally liable for the death of Nicholas, and awarded damages of $925,000 plus interest and costs to his estate. Process Engineering subsequently settled with the plaintiff and withdrew its appeal from this court.

*I. Abatement of Verdict*

■ The plaintiff argues that the trial court erred in abating the verdict against the school district to $150,000. The school district asserts that the plaintiff waived any challenge to abatement of the verdict by failing to file either a declaratory judgment action, *see* RSA 491:22 (1997), or other pleadings prior to objecting to the motion to abate. The statutory procedure, however, for obtaining a declaratory judgment does not impose a mandatory duty to use that procedure. *Cf. Howard v. Hartford Ins. Co.*, 127 N.H. 727, 730, 507 A.2d 230, 231-32 (1986). Furthermore, the plaintiff's objection to the motion to abate provided the trial court and the school district with an adequate and timely opportunity to address the issue. *Cf. State v. Tselios*, 134 N.H. 405, 407, 593 A.2d 243, 245 (1991).

Regarding the merits, RSA 507-B:4, I, provides that the "[l]iability of a governmental unit for bodily injury, personal injury or property damage sustained by any one person in actions brought under this chapter is limited to $150,000." RSA 507-B:4, III directs the court to "abate any verdict to the extent it exceeds the limits prescribed in this section."

To protect against risk of loss, RSA 412:3 (1998) authorizes the State and municipal subdivisions, including school districts, to procure liability insurance. The statute provides:

> In any action against the state or any municipal subdivision thereof to enforce liability on account of a risk so insured against, the insuring company or state or municipal subdivision thereof shall not be allowed to plead as a defense immunity from liability for damages resulting from the performance of governmental functions . . . provided, however, that liability in any such case shall not exceed the limits of coverage specified in the policy of insurance or as to governmental units defined in RSA 507-B, liability shall not exceed the policy limit or the limit specified in RSA 507-B:4, if applicable, *whichever is higher*, and the court shall abate any verdict in any such action to the extent that it exceeds such limit.

RSA 412:3 (emphasis added).

At the time of the accident, the school district was insured under a primary policy with a $1,000,000 personal injury liability limit and an "excess umbrella" policy with a $4,000,000 personal injury limit issued by Reliance Insurance Company. The primary insurance policy was subject to certain endorsements, two of which are at issue here. The first endorsement provides:

> In consideration of the premium charged it is hereby understood and agreed that the General Liability Declarations form . . . is to read as follows:
> Personal Injury and Advertising Injury Limit*
> $150,000. per person/$500,000. per occurrence

The second endorsement states:

> In consideration of the premium charged it is hereby understood and agreed that the limits of liability will be as they appear on [the first endorsement], except:
> 1. Where the specific liability limits of N.H. RSA 507-B do not apply, or
> 2. if any liability limit of N.H. RSA 507-B is found to be unconstitutional then the policy limit will be
> Personal Injury and Advertising Injury* — $1,000,000.

The plaintiff argues that the primary policy provides $1,000,000 in personal injury coverage and that the insurer's attempt to restrict coverage through its limiting endorsements contravenes the letter and intent of RSA 412:3. We agree.

The interpretation of an insurance policy is a question of law for this court to decide. *See Weeks v. St. Paul Fire & Marine Ins. Co.*, 140 N.H. 641, 643, 673 A.2d 772, 774 (1996) (quotation omitted.) "We take the plain and ordinary meaning of the policy's words in context, and we construe the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole." *High Country Assocs. v. N.H. Ins. Co.*, 139 N.H. 39, 41, 648 A.2d 474, 476 (1994).

We read the two endorsements together as purporting to offer the school district personal injury coverage of $150,000 per person, unless the liability limit set forth in RSA 507-B:4, I, is either inapplicable or unconstitutional. If such statutory provision is either inapplicable or unconstitutional, the primary policy provides $1,000,000 in personal injury coverage. We conclude that RSA 507-B:4, I, does not apply when a governmental unit purchases liability insurance that would apply but for the statutory liability limit itself. Accordingly, we hold that the trial court erred in abating the verdict under RSA 412:3. Although the school district may assert the cap on its liability, its insurance company may not. Reliance Insurance Company remains liable up to the $1,000,000 limit of its primary policy.

Our holding flows from the intent behind RSA 412:3. In *Cushman v. Grafton*, 97 N.H. 32, 79 A.2d 630 (1951), this court

concluded that a county's purchase of liability insurance did not render the then-existing rule of municipal immunity inapplicable. *Id.* at 34-35, 79 A.2d at 632. We reasoned that liability insurance is designed to protect the insured in the event of liability, not to create or increase liability that would otherwise not exist. *Id.* at 35, 79 A.2d at 632. Following the *Cushman* decision, the legislature promptly enacted the predecessor to RSA 412:3. *See* Laws 1951, ch. 197; *see also Consoli v. Insurance Company*, 97 N.H. 224, 226, 84 A.2d 926, 927 (1951). Since the purpose of RSA 412:3 is *to permit recovery of damages* against governmental units up to the limit of insurance purchased, *see Merrill v. Manchester*, 114 N.H. 722, 727, 332 A.2d 378, 382 (1974), we refuse to adopt an interpretation of the interplay among RSA 412:3, RSA 507-B:4, I, and the school district's primary policy that would *limit* the recovery of damages despite the purchase of additional insurance coverage.

## II. Loss of Life Damages

The defendants argue that the trial court erred by allowing the plaintiff to introduce evidence of loss of life damages and by instructing the jury that it could compensate the estate for such damages. We disagree.

The trial court instructed the jury that the plaintiff may recover separate damages for the decedent's loss of life, distinct from damages for lost earning capacity or reasonable expenses resulting from the decedent's death. *See* RSA 556:12. The court instructed the jury:

> The estate of Nicholas Marcotte is entitled to be compensated for the loss of life, meaning the probable length of Nicholas Marcotte's life but for the injury. It is entitled to be compensated for the shortening of his life. In other words, there should be compensation awarded by you, after due consideration of the evidence, which recognizes Nicholas Marcotte's inability, by virtue of his shortened life, to carry on and enjoy a life in a way he would have had he lived. Once again, if you find that the estate is entitled to be compensated, you have to assess what this amount would appropriately be.

Because we are "the final arbiter of the intent of the legislature as expressed in the words of the statute," *State v. Telles*, 139 N.H. 344, 346, 653 A.2d 554, 556 (1995), we begin our analysis with an examination of the language of the wrongful death statute.

RSA 556:12 provides:

> If the administrator of the deceased party is plaintiff, and the death of such party was caused by the injury complained of in the action, the mental and physical pain suffered by the deceased in consequence of the injury, the reasonable expenses occasioned to his estate by the injury, *the probable duration of his life but for the injury*, and his capacity to earn money during his probable working life, *may be considered as elements of damage in connection with other elements allowed by law, in the same manner as if the deceased had survived.*

(Emphasis added.) Whether the wrongful death statute allows the estate to recover damages for loss of life is a question of first impression for this court. We conclude that the phrase "the probable duration of his life but for the injury" in RSA 556:12 permits such a recovery.

When determining a statute's intent, we first look to the plain meaning of the statute's words. *See Town of Wolfeboro v. Smith,* 131 N.H. 449, 452, 556 A.2d 755, 756 (1989). Where the language of a statute is clear on its face, its meaning is not subject to modification. *See Corson v. Brown Prods., Inc.,* 119 N.H. 20, 23, 397 A.2d 640, 642 (1979), *appeal after remand,* 120 N.H. 665, 421 A.2d 1005 (1980). We have consistently held that "legislative intent is to be found not in what the legislature might have intended, but rather, in the meaning of what it did say." *State v. Dushame,* 136 N.H. 309, 314, 616 A.2d 469, 472 (1992) (quotation omitted).

The plain language of RSA 556:12 establishes that where the decedent's death "was caused by the injury complained of in the action," the "probable duration of his life but for the injury" may be considered as an element of damages in addition to the other enumerated damage elements: mental and physical pain suffered by the deceased, reasonable expenses occasioned to the decedent's estate, and probable future lost earnings. If duration of life is to be considered as an element of damages, then its constitutive factors, such as quality of life, can also be considered in assessing such damages. *Cf. Sherrod v. Berry,* 629 F. Supp. 159, 163 (N.D. Ill. 1985) (allowing testimony of "hedonic damages" as the "economic . . . moral . . . philosophical . . . [and] all the value with which you might hold life"), *rev'd on other grounds,* 856 F.2d 802 (7th Cir. 1988) (en banc). As one commentator noted:

> The phrase [probable duration of life . . . but for the injury] cannot be read to modify any of the other elements of damages described and has no other apparent purpose.

> Viewed in this light, the statute provides that a decedent's estate may recover for the life expectancy a decedent would have enjoyed but for the untimely death caused by the defendant.

Holmes, *Trial Practice*, 13 N.H. TRIAL BAR NEWS 3, 3 (Spring 1993).

Contrary to the dissent's assertion, the meaning of "the probable duration of his life but for the injury" is plain, avoiding the need to resort to legislative history. *See Brewster Academy v. Town of Wolfeboro*, 142 N.H. 382, 384, 701 A.2d 1240, 1241 (1997) (legislative history not consulted when statutory language plain). The phrase refers to the likely length of the decedent's life if the injury had not occurred, that is, the life that the decedent lost as a result of the injury. We acknowledge that what may be unclear are the precise nature of the attributes of life to be considered and calculations performed in order to estimate damages for loss of life. That same uncertainty, however, afflicts the plain reading of "mental and physical pain suffered," which is a similarly intangible element of damages under RSA 556:12. *See Duguay v. Gelinas*, 104 N.H. 182, 185, 182 A.2d 451, 453 (1962) (decided under prior law). Yet the ambiguities inherent in that phrase, absent judicial interpretation, *see, e.g., Thibeault v. Campbell*, 136 N.H. 698, 702-04, 622 A.2d 212, 215-16 (1993) (mental pain interpreted to include anguish suffered in anticipating accident), have not rendered it inapplicable under our law. Just as we have entrusted the trier of fact with the difficult task of "[t]ranslating pain and anguish into dollars," *Duguay*, 104 N.H. at 185, 182 A.2d at 453, we entrust it with the similarly unenviable task of assessing damages for loss of life. "The law . . . undertakes to do justice as best it can, although of necessity crudely. The solution of the problem is left to the trier's good judgment." *Waldron v. Raccio*, 353 A.2d 770, 775 (Conn. 1974) (citation and quotation omitted). In reading the plain language of a statute, we need not delve deeper, as the dissent would require, than the meaning clear on its face. *See State v. Reid*, 134 N.H. 418, 422, 594 A.2d 160, 163 (1991).

Likewise, we reject the defendants' arguments that "probable duration of his life but for the injury" places parameters on damages for the decedent's "capacity to earn money." According to normal rules of English punctuation, the placement of commas between each element enumerated and before the conjunction, "and," generally dictates that the elements are to be read as a consecutive series of discrete items. *Cf. Elliot Coal Min. v. Dir.,*

*Office of Wkrs. Comp.*, 17 F.3d 616, 630 (3d Cir. 1994) (under normal rules of English punctuation, commas separating nouns in series and before disjunctive indicate that nouns are to be read as series); *Van Patten v. LaPorta*, 539 N.Y.S.2d 132, 134 (App. Div. 1989) (comma before disjunctive indicates intent to discriminate between parts of sentence). The elements enumerated in RSA 556:12 therefore must be read as discrete items of damages, each a distinct part of the series.

More significantly, the modification of capacity to earn money during the more specific term "working life" indicates that the clause describing "probable duration of life" and the clause describing the decedent's "capacity to earn money during his probable working life" were separate issues in the contemplation of the statute's drafters. Otherwise, the element of "probable duration of his life but for the injury" is mere surplusage. The legislature is not presumed to waste words or enact redundant provisions and whenever possible, every word of a statute should be given effect. *See Merrill v. Great Bay Disposal Serv.*, 125 N.H. 540, 543, 484 A.2d 1101, 1103 (1984).

In *Pitman v. Merriman*, 80 N.H. 295, 297, 117 A. 18, 19 (1922), we held that the decedent's "expectancy of life *and* his earning capacity" were "factors for consideration" bearing on the diminution of the decedent's estate. (Emphasis added.) By naming "expectancy of life" and "earning capacity" as separate factors, not one factor modified by another, *Pitman* itself implicitly distinguished between the two elements. The fact that the probable duration of life is also a factor in calculating the decedent's earning capacity does not negate the independent significance of the explicitly stated element of damages, "probable duration of his life but for the injury." *Pitman* thus foreshadowed the recognition that in a wrongful death action, an estate is diminished both by the loss of the decedent's net earnings and the value, translated into dollar figures for the purpose of compensation, of the decedent's lost life. *Cf. Katsetos (Estate of Katsetos) v. Nolan*, 368 A.2d 172, 183 (Conn. 1976).

Similarly, the language that allows each of the elements of damage to be considered "in connection with other elements allowed by law, in the same manner as if the deceased had survived," must be construed. RSA 556:12. This phrase refers to elements of damages recoverable in actions where death is not a factor, *see Burke v. Burnham*, 97 N.H. 203, 206, 84 A.2d 918, 922 (1951), and may include the hedonic element, which is generally compensable as loss of enjoyment of life in bodily injury cases in many jurisdictions. *See,*

*e.g., Mercado v. Ahmed,* 974 F.2d 863, 869 (7th Cir. 1992); *Fraysier v. United States,* 566 F. Supp. 1085, 1090 (S.D. Fla. 1983), *aff'd,* 766 F.2d 478 (11th Cir. 1985); *Schumacher v. Cooper,* 850 F. Supp. 438, 453 (D.S.C. 1994); *McAlister v. Carl,* 197 A.2d 140, 145 (Md. 1964). Because we find that loss of life damages are provided by the enumerated element of damage, "probable duration of his life but for the injury," we need not determine the nature or scope of the hedonic element, if it exists, encompassed by the phrase, "other elements provided by law."

The dissent relies heavily on its interpretation of the legislative history of RSA 556:12 to conclude that the statute does not provide for loss of life damages. Even if we assumed, for the purpose of addressing the dissent's concerns, that the construction of RSA 556:12 requires a consideration of the statute's history, we nonetheless arrive at the same conclusion that loss of life damages are available in a wrongful death action.

At common law, no action for personal injuries resulting in death could be maintained unless the injured party commenced an action before his death. *See Piper v. Railroad,* 75 N.H. 435, 444, 75 A. 1041, 1046 (1910); *Clark v. Manchester,* 62 N.H. 577, 582 (1883). The first statutory enactment in New Hampshire regarding commencement of post-death lawsuits permitted executors to recover damages for personal injuries resulting in death. *See* Laws 1879, 35:1. This survival statute, however, did not allow recovery of damages for the death itself. *West v. Railroad,* 81 N.H. 522, 526, 129 A. 768, 770 (1925). In 1887, the legislature enacted a cause of action for wrongful death. Laws 1887, ch. 71. Unlike the previous statute, the act of 1887 broadened the scope of recovery and "provided for the consideration of the fact of death in the assessment of damages." *Piper,* 75 N.H. at 443, 75 A. at 1047; *see also West,* 81 N.H. at 527, 129 A. at 771.

In 1891, the survival and wrongful death provisions were consolidated into a single statute. *See* PS 191:8-:13 (1891); *see also West,* 81 N.H. at 527, 129 A. at 771. Although this provision contained variations from the act of 1887, the alterations in language, syntax, and grammar were not intended to effect any substantive changes in the measure of damages for wrongful death. *See, e.g., Burke,* 97 N.H. at 206, 84 A.2d at 922; *Morrell v. Gobeil,* 84 N.H. 150, 151, 147 A. 413, 414 (1929).

In 1971, the legislature added two notable phrases to the wrongful death statute. *See* RSA 556:12 (1971). First, the legislature added the phrase "during his probable working life" to the clause relating to "capacity to earn money." *Id.* Second, the legislature added the

phrase "in the same manner as if the deceased had survived" to the end of the statutory provision. *Id.* These revisions further evince the legislature's intent to include loss of life damages as a separate element of damages under the wrongful death statute. In 1997, the legislature made minor stylistic changes to the section at issue and added a section permitting the trier of fact to award damages to a decedent's surviving spouse for the loss of comfort, society, and companionship. *See* RSA 556:12 (Supp. 1997).

The defendants argue that our prior decisions have addressed and negated the compensability of loss of life damages. Our review of these cases reveals the contrary. A number of our decisions interpreting the act of 1891 indicate that the wrongful death provision allows for recovery of damages for loss of life.

In *West*, 81 N.H. at 522, 129 A. at 768, the decedent commenced an action for negligence during his lifetime, and his administratrix prosecuted the action after his death. The 1891 wrongful death provision did not apply because the action was commenced before the death of the injured party. *Id.* at 527-28, 129 A. at 772. The specific issue confronting this court was "not whether the administrator [could] recover for his decedent's death, but whether that death, caused by the defendant's wrong, [could] be used to cut down damage otherwise recoverable." *Id.* at 529, 129 A. at 771-72. We held that in an action for personal injuries brought by the injured person during his lifetime and prosecuted by his administrator after his death as a result of the injuries complained of, the decedent's estate may recover the loss of his earning capacity for the probable duration of his life. *Id.* at 529, 129 A. at 772.

We reasoned that our conclusion would have been the same under the 1879 survival statute. *Id.* at 526, 129 A. at 771. We also noted that the act of 1887 was intended to provide for the recovery of damages not available under the 1879 survival statute. *Id.* at 527, 129 A. at 771. Specifically, we emphasized that the act of 1887 "broadened the scope of the recovery" and "included the death itself as an element." *Id.*

*West* foreshadowed the issue currently before this court:

> Recovery for death — for the deprivation of the right to live — may be a different thing from recovery for loss of capacity to earn money. Heretofore no distinction has been drawn in the decisions in this jurisdiction between these two. Its economic rather than its sentimental value has not been considered. Whether in the suit instituted by an administrator for the benefit of certain relatives the recov-

ery provided for by [the 1891 wrongful death provision] includes sentimental value, is a question which is not involved here.

*Id.* at 529, 129 A. at 772 (quotation and citation omitted).

The defendants inappropriately argue that *Ham v. Interstate Bridge Authority*, 92 N.H. 268, 30 A.2d 1 (1943), supports the theory that damages for loss of life are not recoverable in wrongful death actions. *Ham*, like *West*, was a negligence action commenced by the decedent before death and thereafter prosecuted by his executrix. *Ham*, 92 N.H. at 269, 30 A.2d at 3. Following the death, the executrix sought to amend the pleadings to add allegations relating to the fact that death resulted from the defendant's negligence. *Id.* The *Ham* court specifically noted that the 1891 wrongful death provision did not apply. *Id.* at 275, 30 A.2d at 6. We held that damages for loss of life are not available in an action brought *before* the decedent's death:

> In the nature of things one may not himself receive compensation for the wrongful loss of his right to live, and claim for the loss cannot be an asset of his estate in any fair view of the compensatory principle of allowable elements of damages. While allowance for bodily and mental suffering is granted as in justice imposed on a wrongdoer, the estimate must be within the bounds of justice. To allow for the enjoyment of continued life would mean an entrance into a boundless field of arbitrary assessment, for which no policy of the law exists. The limitation of damages in actions for death brought under the statute indicates that the policy for any allowance is of restriction.

*Id.* at 275-76, 30 A.2d at 6.

Our refusal to award damages for the loss of life merely represented a restatement of the common law. In *Piper*, 75 N.H. at 444, 75 A. at 1046, we construed the 1891 statute as not altering the rules of damages applicable to actions that had been commenced before the decedent's death. In *Ham*, we expressly acknowledged this point in cautioning that the "statutory action brought after death is not in point, and the extent of recovery under it does not call for discussion." *Ham*, 92 N.H. at 275, 30 A.2d at 6.

In *Burke*, 97 N.H. at 210, 84 A.2d at 924, we considered loss of life damages compensable under the wrongful death provision of the act of 1891. In *Burke*, the decedent had settled during her lifetime with one tortfeasor for $7,500 in exchange for a release. *Burke*, 97 N.H.

at 203, 84 A.2d at 920. After her death, the decedent's executrix commenced an action against a second tortfeasor regarding the same incident. *Id.* at 204, 84 A.2d at 920. The defendant contended that the decedent's settlement with the other tortfeasor and a provision in the act of 1891 limiting damages to $7,000 precluded any additional recovery. *Id.* at 205, 84 A.2d at 921.

We examined the relationship among the survival and wrongful death provisions of the act of 1891 and discussed the damages available under various scenarios. *Id.* at 206-10, 84 A.2d at 921-24. We initially stated that damages set forth in the wrongful death provision applied only in an action commenced after death, where death resulted from the injuries caused by the defendant. *Id.* at 209, 84 A.2d at 923. We emphasized that "[i]f it is found that death resulted [from the defendant's wrong], recovery may be had under [the wrongful death provision]. If it is found that it did not, recovery is governed by the rules of damages which pertain in an action brought before death." *Id.*

Next, we rejected the executrix's argument that she possessed two distinct causes of action against the defendant; namely, an action accruing to the decedent during her lifetime that survived and an action for damages resulting from the death of the decedent. *Id.* at 209, 84 A.2d at 923. We noted that the theory would allow double recovery for the same injuries, including pain and suffering, expenses occasioned by the injuries, lost net earnings, and loss of prospective earning capacity. *Id.* at 207, 84 A.2d at 922. We emphasized that the wrongful death provision, in contrast to an action brought before death, provides "a somewhat broader rule of damages" and "enlarg[es] the recoverable damages." *Id.* at 206, 207-08, 84 A.2d at 922, 923.

In concluding that the $7,000 statutory limitation on damages applied only to wrongful death actions and not to survival actions, we explained in *Burke*:

> Such a distinction is not without basis in logic. Damages for injuries to the decedent are restricted within definite limits established by the common law. *Cf. West v. Railroad,* 81 N.H. 522, 529. Recovery for injuries causing death . . . however, suggests more speculative elements of damage as to which there has been a "policy . . . of restriction" by arbitrary limit. *Ham v. Authority,* [92 N.H. at 276].

*Burke,* 97 N.H. at 210, 84 A.2d at 924.

We previously explained in *Ham* that "[t]he limitation of damages in actions for death brought under the statute indicates that the

*policy for any allowance [for the enjoyment of continued life] is of restriction." Ham,* 92 N.H. at 276, 30 A.2d at 6 (emphasis added). Thus, despite the defendants' contention, *Ham* and *Burke* not only fail to foreclose the recovery of damages for loss of life, but also suggest that the wrongful death provision permits recovery for the "enjoyment of continued life" and that the $7,000 statutory limitation in effect at that time was intended, in part, to restrict such damages. *See Burke,* 97 N.H. at 210, 84 A.2d at 924; *Ham,* 92 N.H. at 276, 30 A.2d at 6.

Moreover, in comparing damages available to the decedent at the time of her settlement with damages available to the decedent's executrix in her post-death wrongful death action, we noted in *Burke*:

> Obviously no claim could effectively have been made by the decedent for death resulting from the injuries. *Ham v. Authority,* 92 N.H. 268, 275. Thus certain of the damages recoverable in the pending [wrongful death] action could not have been satisfied by the settlement. On the other hand, so far as now appears every element of damage which the decedent may have claimed in effecting the settlement may be considered in the pending action. R.L., c. 355, s. 12.

*Burke,* 97 N.H. at 211, 84 A.2d at 925.

Accordingly, *Burke* stands for two related propositions that support the compensability of loss of life damages under the wrongful death provision. First, damages available under the wrongful death provision include all of the damages available in survival actions. The converse, however, is not also true. The wrongful death provision "provides a somewhat broader rule of damages" and "enlarg[es] the recoverable damages." *Id.* at 206, 207-08, 84 A.2d at 922, 923. Since damages for pain and suffering, for expenses occasioned by the injuries, for net earnings lost, and for loss of prospective earning capacity are available in survival actions, the wrongful death statute provides different, additional damages. Because we characterized these additional damages as "more speculative elements of damage" in *Burke,* it is obvious that we were not referring to funeral expenses. *Id.* at 210, 84 A.2d at 924. In fact, *Burke* indicates that the additional damages available under the wrongful death provision are the very damages for loss of "continued enjoyment of life" that we held in *Ham* were not available in a survival action. *See id.; Ham,* 92 N.H. at 275-76, 30 A.2d at 6.

The defendants also inappropriately rely on *Thibeault v. Campbell,* 136 N.H. 698, 622 A.2d 212 (1993), in arguing that the

1971 wrongful death statute does not provide recovery for loss of life damages. In *Thibeault,* we addressed the issue of the compensability of pre-accident fright under RSA 556:12. *Id.* at 702, 622 A.2d at 215. The jury awarded $1.5 million to one of the plaintiffs, where medical and funeral expenses approximated $6,700, lost earnings at present value amounted to roughly $367,000, and decedent suffered only seconds of pre-accident mental anguish. *Id.* at 704, 622 A.2d at 215-16. Finding the jury's verdict exorbitant and unreasonable, we vacated and remanded for a new trial on damages. *Id.* at 704, 622 A.2d at 216.

Seizing on this court's failure to identify loss of life damages in the discussion of RSA 556:12, the defendants suggest that we resolved the loss of life damages issue by omission. The parties in *Thibeault,* however, did not litigate the compensability of damages for loss of life. The issue of the availability of damages for loss of life was not before the court, and any *sub silentio* rejection of loss of life damages was pure dicta.

Additionally, the recognition that RSA 556:12 provides damages for loss of life comports with the scheme of damages allowed under the statute. Except for a recent legislative amendment allowing the minor child of a decedent to recover for loss of familial relationship, RSA 556:12, III (Supp. 1998), damages under RSA 556:12 are awarded only to compensate for injuries suffered by the decedent and his or her estate, *Siciliano v. Capitol City Shows, Inc.,* 124 N.H. 719, 728, 475 A.2d 19, 23-24 (1984). In a wrongful death action, life itself is one of the losses, arguably the most important, suffered by the decedent. In seeking compensation for its losses resulting from the decedent's death, therefore, the estate may properly seek recovery for the decedent's loss of life.

██ Based on the plain meaning of RSA 556:12 and our cases interpreting similar older versions of the statute, we hold that damages for loss of life are recoverable as a separate element of damages under the wrongful death statute. Accordingly, the trial court appropriately instructed the jury that it could compensate the decedent for loss of life.

*III. Evidentiary Rulings*

Next, the defendants contend that the trial court erred in admitting, over their New Hampshire Rule of Evidence 403 objections, the decedent's computer diary and various photographs depicting the decedent and his belongings to prove loss of life damages. The defendants also contend that the court erred in admitting, over their Rule 403 objections, various photographs of

the accident scene, including two photographs depicting the blood-stained ground.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. EV. 401. Evidence which is not relevant is inadmissible. N.H. R. EV. 402. "The determination of whether evidence is relevant is within the sound discretion of the trial court, and we will not reverse its determination absent evidence of abuse of that discretion." *State v. Smith*, 135 N.H. 524, 525, 607 A.2d 611, 612 (1992) (quotation omitted). Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. N.H. R. EV. 403. Likewise, this determination rests within the sound discretion of the trial court. *See State v. Stayman*, 138 N.H. 397, 402, 640 A.2d 771, 774 (1994). To demonstrate an abuse of discretion, the defendant must establish that the trial court's ruling was "clearly untenable or unreasonable to the prejudice of [the defendant's] case." *Id.* (quotation omitted).

We first address the defendants' argument that the court erred in admitting the decedent's computer diary and various photographs depicting the decedent and his belongings. In weighing the computer diary's probative value against its prejudicial effect, the court found the diary highly probative of the decedent's lost earning capacity, creativity, and ability to process the English language. Noting that the diary specifically highlighted the activities that the decedent enjoyed, the court appropriately determined that the diary also went "right to the heart of hedonic damages."

. In addition, the court carefully weighed the requirements of Rules 401 and 403 in determining that several of the photographs, including photographs of the decedent, his home, and his family from the time he was born through the last two years of his life, had "little or no probative value, and thus had a prejudicial effect now based on the sympathy which they might elicit from the jury." The photographs admitted, however, highlighted the decedent's activities and achievements during the last two years of his life, focusing on his participation in karate, T-Ball, and football, providing admissible evidence of the value of decedent's lost life.

The admitted photographs further depicted the decedent's abilities and physical health, probative of the issue of damages, especially in light of the defendants' challenge to the state of the decedent's health prior to the accident. Even if these photographs were not *prima facie* admissible, they became probative when the

defendants challenged the decedent's health. *See, e.g., Hackett v. Railroad,* 89 N.H. 514, 519, 6 A.2d 139, 142 (1938).

Because on the record before us we cannot say that the probative value of the evidence was substantially outweighed by the risk of unfair prejudice, *see* N.H. R. EV. 403, we hold that the trial court did not abuse its discretion in permitting the introduction of the photographs and computer diary. We agree with the trial court that this evidence was relevant to prove damages for loss of life and helpful to the jury in assessing the amount to award for such damages. *See Stayman,* 138 N.H. at 402, 640 A.2d at 774. The defendants have not shown that the court's ruling was clearly untenable or unreasonable to the prejudice of their case, *see id.,* and thus have not demonstrated an abuse of discretion.

We next address the defendants' argument that the court erred in admitting photographs of the accident scene. After performing a balancing test and eliminating some of the photographs as cumulative, the court admitted four photographs, two depicting the soccer goal, one depicting the goal and the bloody spot, and one depicting the bloody spot only.

The court properly determined that all of the photographs were helpful to the jury in understanding the mechanism of the accident and resulting death. Moreover, the court later instructed the jury that "[t]here has been no claim in this case that the decedent, Nicholas Marcotte, experienced any pain, suffering, discomfort or mental anguish before his death. Therefore, you may not consider these factors when determining damages, and therefore, you may not award damages for pain and suffering." In light of the court's limiting instruction, which the jury is presumed to have followed, *see id.,* and the great deference accorded to the trial judge in these matters, we find the court did not abuse its discretion in admitting the photographs.

*IV. Jury Instructions*

Next, the soccer league contends that the trial court erred by refusing to instruct the jury on the doctrine of intervening/superseding causes.

Jury instructions serve to identify issues of material fact, and to inform the jury of the appropriate standards of law by which to decide them. *Johnston v. Lynch,* 133 N.H. 79, 89, 574 A.2d 934, 940 (1990). A jury charge is sufficient as a matter of law if it fairly presents the case to the jury such that no injustice is done to the legal rights of the parties. *Broderick v. Watts,* 136 N.H. 153, 163-64, 614 A.2d 600, 607 (1992). "The test for determining whether an

erroneous civil jury charge is reversible error is whether the jury *could have been* misled. If the court adequately states the law that applies to the case, it is not required to use the identical language requested by a party. *Id.* at 164, 614 A.2d at 607. "The fact that the jury deliberated and returned a verdict without requesting any clarification of the charge is a strong indication that they were not confused." *Faust v. General Motors Corp.*, 117 N.H. 679, 686, 377 A.2d 885, 889 (1977).

At the close of the evidence, the soccer league requested the judge to inform the jury that its negligence, if any, could be superseded by the subsequent negligence of the school district in failing to respond to clear warnings that the soccer goal was dangerous. The soccer league contends that the school district's failure to properly maintain the goal absolves it of any liability for the design, fabrication, installation, and utilization of the goal.

The court did not abuse its discretion in ruling that the soccer league failed to present any evidence that the alleged misuse of the soccer goal was not reasonably foreseeable so as to warrant a superseding/intervening cause instruction. Generally, an independent intervening cause will not interfere with the connection between the original act and the injury if the intervention was probable or foreseeable. *See Reid v. Spadone Mach. Co.*, 119 N.H. 457, 465, 404 A.2d 1094, 1099 (1979); *see also* 57A AM. JUR. 2D *Negligence* § 620 (1989). In instructing the jury on foreseeability, the court fairly presented the case to the jury and accurately stated the applicable law. Accordingly, we find no error in the court's refusal to give the requested superseding/intervening cause instruction.

*V. Excessiveness of Damage Award*

Finally, we address the defendants' argument that the trial court erred in refusing to set aside the $925,000 damage award as excessive. An examination of the record reveals sufficient evidence to support the award.

"[D]irect review [of a damages award] is the responsibility of the trial judge, who may disturb a verdict as excessive (or inadequate) if its amount is conclusively against the weight of the evidence and . . . if the verdict is manifestly exorbitant." *Daigle v. City of Portsmouth*, 129 N.H. 561, 588, 534 A.2d 689, 704 (1987) (citations and quotations omitted). We have emphasized that a trial court's refusal to set aside the verdict as excessive will not be overruled unless the damages are so exorbitant that no reasonable person could conclude that the jury was not influenced by partiality or

prejudice, or misled by some mistaken view of the merits of the case. *See, e.g., id.; Champion v. Smith,* 113 N.H. 551, 552, 311 A.2d 132, 133 (1973). "Our task upon review is not to attempt to ascertain or divine the one and only correct verdict." *Steel v. Bemis,* 121 N.H. 425, 428, 431 A.2d 113, 116 (1981).

The trial court acted reasonably in refusing to set aside the verdict as excessive. The plaintiff averred proof of funeral expenses in the amount of $6,386 and the plaintiff's economist testified that the net loss to the decedent's estate as a result of the decedent's lost earning capacity was $707,246. Although the plaintiff's expert testified that the economic loss to the decedent's estate amounted to slightly more than $700,000, the plaintiff presented sufficient evidence regarding the decedent's loss of life to support the jury's verdict of $925,000. The defendants do not allege that the jury was mistaken on the facts, or that the jury was impassioned, impartial, or corrupt. Based on our review of the record, we do not believe that the jury's verdict was conclusively against the weight of the evidence and manifestly exorbitant.

Moreover, no one to our knowledge has been able to devise a formula by which compensation for the loss of life can be determined with precision. Damages for this loss, like damages for pain and suffering, are too subjective to lend themselves to such exactness. *Cf. Duguay,* 104 N.H. at 185, 182 A.2d at 453 (translating pain and anguish into dollars is arbitrary process not subject to measurement). Consequently, the trial court was correct in not permitting economic testimony to be used in computing loss of life damages. We rely heavily upon the jury and the trial court, who hear the testimony and weigh the facts, to reach a just result. While we might not have awarded the same amount of damages had we been the fact finder in this case, we cannot say that no reasonable person could have reached such a result.

*Affirmed in part; reversed in part.*

BRODERICK, J., did not sit; BATCHELDER, J., retired, sat by special assignment under RSA 490:3; BROCK, C.J., concurred in parts II, III, IV, and V of Justice Horton's opinion; THAYER, J., with whom BROCK, C.J., joined in part II, dissented; JOHNSON and BATCHELDER, JJ., concurred.

THAYER, J., dissenting: Because I disagree with the majority's conclusions regarding hedonic damages and abatement of the verdict against the school district, I respectfully dissent.

*I. Loss of Life Damages*

The majority concludes that under RSA 556:12 (1997) (amended 1997, 1998), the phrase "probable duration of his life but for the injury" plainly read allows for recovery of the loss of life or the quality of life, commonly referred to as "hedonic damages." *See* BLACK'S LAW DICTIONARY 391 (6th ed. 1990). The majority, in my opinion, misconstrues both the statute and our prior case law interpreting the statute.

For nearly one hundred years, our case law has interpreted the phrase "probable duration of his life but for the injury" as a factor in calculating the net earning capacity of the decedent. *See Pitman v. Merriman*, 80 N.H. 295, 295-98, 117 A. 18, 19 (1922); *Carney v. Railway*, 72 N.H. 364, 376, 57 A. 218, 224 (1903); *Burke v. Burnham*, 97 N.H. 203, 209, 84 A.2d 918, 922 (1951); *Bouthiette v. Wiggin*, 122 N.H. 774, 775-77, 451 A.2d 368, 369-70 (1982). In *Pitman*, we explained the proper method of calculating net earning capacity under PS 191:12 (1891), the wrongful death statute then in effect. *Pitman*, 80 N.H. at 297-98, 117 A. at 19. "[T]he amount which [the deceased] could earn for his estate or the benefit of others would be what remained after deducting the necessary expense of his own living." *Id.* at 297, 117 A. at 19. Accordingly, "his expectation of life and his earning capacity are named as factors for consideration" in making this calculation. *Id.* We have since consistently applied this interpretation. The legislature's reenactment of the wrongful death statute, in light of our decisions, constitutes an adoption of our longstanding interpretation. *Thibeault v. Campbell*, 136 N.H. 698, 702, 622 A.2d 212, 215 (1993). *Compare* PS 191:12 *with* RSA 556:12 ("probable duration of his life but for the injury" phrase unchanged).

Despite our longstanding interpretation, the majority now assigns new meaning to the phrase "the probable duration of his life but for the injury" based on its asserted plain meaning. While I agree that the plain meaning of the phrase calls for a calculation of the likely length of the deceased's life if the injury had not occurred, the majority finds a new purpose for this calculation that is not clear from the plain meaning of the statute. Because the majority does not overturn our prior interpretation, this phrase now serves two purposes and is at the very least ambiguous. Further, the majority admits that the precise nature of the attributes of life to be considered is unclear; therefore the statutory language is ambiguous. *Cf. Greenhalge v. Town of Dunbarton*, 122 N.H. 1038, 1040, 453 A.2d 1295, 1296 (1982). "Where the statutory language is ambiguous

or where more than one reasonable interpretation exists, we review legislative history to aid in our analysis." *K & J Assoc. v. City of Lebanon*, 142 N.H. 331, 333, 703 A.2d 253, 254 (1997). The majority, however, rests its holding on a plain language analysis of the statute.

The statute's history clearly manifests the legislature's intent regarding the scope of recoverable damages. "Because the wrongful death action is a creature of statute without common law origins, it survives only to the extent and in the manner provided by the legislature." *Hebert v. Hebert*, 120 N.H. 369, 370, 415 A.2d 679, 680 (1980). Thus, damages for the loss of life are recoverable only if provided for by the legislature.

"At common law, causes of action which affect the estate survive . . . and those which affect only the person die with the person." *French v. Mascoma Co.*, 66 N.H. 90, 96, 20 A. 363, 363 (1889). Therefore, a common law action for personal injury resulting in death could not be maintained. *See Wyatt v. Williams*, 43 N.H. 102, 108-09 (1861). In 1879, the legislature enacted a generally applicable personal injury action survival statute. *See* Laws 1879, ch. 35. This survival statute for the first time allowed a representative to recover the damages that the person injured would have been entitled to recover had death not ensued. *Clark v. Manchester*, 62 N.H. 577, 584 (1883). The damages recoverable under chapter 35 included all the damages the deceased could have recovered had the deceased lived. They were assessed, however, based on the deceased's actual life, not the deceased's life expectancy but for the injury. *Corliss v. Railroad*, 63 N.H. 404, 404-05 (1885).

In 1887, the legislature repealed and replaced chapter 35. *See* Laws 1887, ch. 71. Recovery for losses sustained by the deceased on account of the harm during the deceased's lifetime, which were the elements of damage under the survival statute, remained unchanged. The legislature recognized that in addition to the injury to the deceased, the deceased's estate suffered an injury by reason of the death due to the deceased's lost earning capacity during the deceased's expected lifetime. *Pitman*, 80 N.H. at 297, 117 A. at 19. For this reason, recovery for losses caused by the deceased's death, *i.e.*, the wrongful death elements, were added. Accordingly, the replacement statute combined the survival and wrongful death damages and provided:

> In assessing said damages there shall be considered the mental and physical pain of the injured person, the expense occasioned to him in his life and to his estate upon his

decease, his age, and *his probable duration of life* and earning capacity but for said wrongful act or neglect.

Laws 1887, 71:1 (emphasis added). Thus, the wrongful death elements — the expense occasioned to the deceased's estate, the deceased's age, probable duration of life, and earning capacity — became factors in determining the diminution of the estate by reason of the death. *Pitman,* 80 N.H. at 297-98, 117 A. at 19. The damages recoverable under this expanded statute covered the losses actually suffered by the deceased during life and the losses suffered by the deceased's estate by reason of the death.

"[I]n slightly different form, but without any change in substance," the statute specified these same elements in the 1891 reenactment. *Carney,* 72 N.H. at 376, 57 A. at 224. It provided:

> [T]he mental and physical pain suffered by him in consequence of the injury, the reasonable expenses occasioned to his estate by the injury, *the probable duration of his life but for the injury,* and his capacity to earn money, may be considered as elements of damage in connection with other elements allowed by law.

PS 191:12 (emphasis added). "As bearing [on the diminution of the deceased's estate because of the destruction of his ability to create one], his expectation of life and his earning capacity [were] named as factors for consideration." *Pitman,* 80 N.H. at 297, 117 A. at 19. Although the deceased would have been entitled to the gross amount of his lost earning capacity had he lived, "the amount which he could earn for his estate or the benefit of others would be what remained after deducting the necessary expense of his own living [during his expectation of life but for the injury]." *Id.* Thus, "probable duration of his life but for the injury" is a factor in determining the value to the estate of the deceased's earning capacity.

The majority asserts that the legislature intended to broaden the scope of recovery in 1887 so as to include loss of life damages. While the scope of recovery was broadened to include losses suffered by reason of death, the legislature limited the wrongful death damages to those enumerated in the statute. As *Pitman* demonstrates, one limiting factor was the deduction of the necessary expense of the deceased's own living as determined by the deceased's probable duration of life but for the injury. This phrase, which the legislature intended as a limitation on recoverable damages, the majority now interprets as expanding recoverable damages.

We have noted that recovery for deprivation of the right to live as a concept may be distinct from recovery for loss of capacity to earn

money. *West v. Railroad*, 81 N.H. 522, 529, 129 A. 768, 772 (1925). The majority suggests that *West*, by commenting on the distinction in 1925, can be used to support the majority's position that recovery of loss of life damages is appropriate under the wrongful death statute. Although the statutory action brought after death and the extent of recovery under it were not at issue, we noted in a 1943 case that:

> In the nature of things one may not himself receive compensation for the wrongful loss of his right to live, and claim for the loss cannot be an asset of his estate in any fair view of the compensatory principle of allowable elements of damages. While allowance for bodily and mental suffering is granted as in justice imposed on a wrongdoer, the estimate must be within the bounds of justice. To allow for the enjoyment of continued life would mean an entrance into a boundless field of arbitrary assessment, for which no policy of the law exists. The limitation of damages in actions for death brought under the statute indicates that the policy for any allowance is of restriction. It is sometimes said that a wrongdoer is better off in causing death than in causing severe and lasting injury without death. If this may be considered in the balance of adjustments in social relations, it does not serve to outweigh the reasons which bar allowance for damage on this account.

*Ham v. Interstate Bridge Authority*, 92 N.H. 268, 275-76, 30 A.2d 1, 6 (1943). Even though the statute included the phrase "probable duration of his life but for the injury," the discussion in *Ham* clearly indicates that this court did not understand that phrase to include damages for loss of life. Following this court's decisions in *West* and *Ham*, if the legislature had intended to make the kind of policy decision discussed in *Ham* and include loss of life damages, it would have stated so in plain language.

The majority finds further support for its interpretation of the phrase "probable duration of his life but for the injury" in the statute's 1971 amendment. Laws 1971, ch. 490. HB 149 originated as a bill to repeal the dollar limitations on recovery in wrongful death actions. N.H.H.R. JOUR. 143 (1971). The senate proposed additional changes including changes in RSA 556:12. N.H.S. JOUR. 545-47 (1971). The amendment proposed by the senate provided:

> [D]amages in the case of such death would involve taking into consideration the probable duration of the life of the

deceased, but for the injury, and his capacity to earn money during his probable working life measured by his probable gross earnings during such period without reduction by reason of the application of any discount factor or on account of the probable expense of the maintenance or subsistence of the deceased had he survived, among other elements.

*Id.* at 1944. The senate and house conference committee rejected the proposal to forego reduction based on the probable expense of the maintenance of the deceased, but agreed that damages would be calculated without a discount factor. *See id.* at 1944-45. Accordingly, the legislature added the clauses "during his probable working life" and "in the same manner as if the deceased had survived." *See id.* In making this change the legislature intended to clarify the method of damages calculation, *see id.* at 1945, not to make hedonic damages recoverable. In fact, Senator Nixon expressly explained that this language was intended to mean that "no discount or interest rate is to be applied in the damages calculation process, but a reduction should probably be made from the deceased's probable total gross lifetime earnings had he survived to allow for what his subsistence expenses would have been." *Id.* Accordingly, contrary to the majority's assertion, both the phrase "probable working life" and the phrase "probable duration of his life" are given effect.

The legislature gave no indication that the scope of damages recoverable under the statute was to be changed or that "probable duration of his life but for the injury" had taken on new meaning. Further, in light of our prior rulings, the legislature is deemed to have adopted our longstanding interpretation of the scope of damages recoverable by retaining the phrase when it reenacted the statute. *See Thibeault,* 136 N.H. at 702-03, 622 A.2d at 215. Moreover,

> [i]t is not the function of the judiciary to provide for present needs by an extension of past legislation. Readoption of a statute without change of language implies no change from its original meaning and invites no expanded construction. A law means what it meant to its framers, and its mere repassage does not alter that meaning. While legislation of past enactment and still in force may be applicable to new conditions, it may not be amended or amplified by the courts to meet them.

*State v. Richardson,* 92 N.H. 178, 180-81, 27 A.2d 94, 97 (1942) (citations omitted). Since 1971, we have continued to construe RSA

556:12 as providing damages for "the losses sustained by the deceased on account of the harm *during his lifetime*" and the value of *earning capacity less living expenses during the period of his life expectancy. Lozier v. Brown Company*, 121 N.H. 67, 69-70, 426 A.2d 29, 31 (1981) (emphasis added).

Recent legislative discussions regarding the statute also support this interpretation. In 1991, the senate considered amending the statute to expand the damages to extend loss of consortium beyond the deceased's life. N.H.S. JOUR. 282 (1991). At that time, Senator Hollingworth, a proponent of the amendment, explained that under the statute, the *only* damages the estate may recover are: (1) "pain and suffering" experienced by the deceased up to death; (2) "the hospital cost, the burial cost and the taxes"; and (3) "what the deceased person would have earned in his lifetime." *Id.* at 283-84. Senator Hollingworth's understanding is supported by decisions from this court that enumerate each element of damages recoverable without suggesting that any other possible element of damages, such as hedonic damages, is recoverable. *See Baker v. Salvation Army*, 91 N.H. 1, 5-6, 12 A.2d 514, 517 (1940); *Pierce v. Mowry*, 106 N.H. 306, 306-07, 210 A.2d 484, 485 (1965); *Lees v. Nolan*, 121 N.H. 680, 681, 433 A.2d 1287, 1288 (1981); *Bouthiette*, 122 N.H. at 775, 451 A.2d at 369-70; *Thibeault*, 136 N.H. at 702-04, 622 A.2d at 215-16. Therefore, based on the statute's history, I conclude the legislature did not specifically provide for, and did not intend to include damages for, loss of life under RSA 556:12.

Under these circumstances, by allowing for hedonic damages, the majority has entered into a policymaking field reserved for our legislature. Recovery for wrongful death does not exist at common law. Therefore, all damages recoverable in a wrongful death action stem from the statute and are limited by the statute. *See Hebert*, 120 N.H. at 370, 415 A.2d at 680. By extending recovery beyond the remedy the statute provides, the majority expands common law liability.

In 1984, we were similarly asked to expand the scope of recoverable damages associated with a wrongful death action by allowing surviving parents to recover for loss of society. *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 723-29, 475 A.2d 19, 21-23 (1984). In *Siciliano*, we based our decision "on public policy considerations, with reference to judicial and statutory precedent." *Id.* at 725, 475 A.2d at 21-22. As *Ham* noted, the compensatory principle of tort law, as well as the speculative nature of assessing damages, are relevant considerations. *Ham*, 92 N.H. at 275-76, 30 A.2d at 6. Loss of life, like loss of a child's society, "is an intangible, nonpecuniary loss

which can never properly be compensated by money damages. The emotional nature of the loss makes defining and quantifying damages difficult, which may lead to disproportionate awards." *Siciliano*, 124 N.H. at 725, 475 A.2d at 22. This difficulty in defining damages also denies the appellate court meaningful review of awards. Further, as we stated in *Siciliano*, "the social burden of providing damages for this loss will ultimately be borne by the public through increased insurance premiums or in the enhanced danger that accrues from the greater number of people who will choose to go without insurance." *Id.* (quotation omitted). Following *Siciliano*, the legislature carefully balanced these considerations and amended the statute twice in the past two years to provide limited recovery for loss of society to a surviving spouse or parent. *See* Laws 1997, 260:1; Laws 1998, 348:1. A review of the legislative history indicates the legislature never made such a public policy determination regarding recovery of loss of life damages. Today, the majority fails to take public policy considerations into account in expanding liability beyond the damages allowed by the statute.

## II. Abatement of Verdict

The majority also holds that the school district's attempt to restrict coverage through its limiting endorsements contravenes the letter and intent of RSA 412:3 (1998). By voiding the endorsements, the majority extends the benefit of coverage beyond both the intended scope of RSA 412:3 and the insurance policy as contemplated by the contracting parties. Because I believe the trial court applied RSA 507-B:4 (1997) and RSA 412:3 in accordance with the legislature's intent, I would affirm the trial court's abatement of the verdict against the school district.

The majority correctly states that through the insurance policy and its endorsements, the school district attempts to take full advantage of the statutory cap provided by RSA 507-B:4. At the same time, the school district seeks to insure against risks not protected by the statutory cap. Contrary to the majority's holding, this scheme comports fully with the letter and intent of RSA 412:3.

To protect against risk of loss, RSA 412:3 authorizes the State and municipal subdivisions, including school districts, to procure liability insurance. RSA 412:3 in pertinent part provides:

> In any action against [a governmental unit] to enforce liability *on account of a risk so insured against*, the [governmental unit] shall not be allowed to plead as a defense immunity from liability . . . provided, however, that liability in any such case shall not exceed the limits of

coverage specified in the policy of insurance or as to governmental units defined in RSA 507-B, *liability shall not exceed the policy limit or the limit specified in RSA 507-B:4, if applicable, whichever is higher,* and the court shall abate any verdict in any such action to the extent that it exceeds such limit.

(Emphasis added.) This statute clearly provides that when a governmental unit purchases insurance coverage for specific risks, it may not plead immunity as a defense when liability on account of that specific risk arises. The policy limit of insurance purchased, however, may not be used as a tool to further reduce the limit provided by RSA 507-B:4.

The school district purchased a general liability insurance policy to cover three different risks in accordance with RSA 412:3. First, the policy provided coverage up to $150,000 per person to cover personal injury liability for actions arising under RSA 507-B:4. All parties agree that RSA chapter 507-B permits the suit to be brought against the school district. RSA 507-B:4, however, limits the school district's liability for personal injury damages to $150,000. Because the school district purchased coverage for personal injury liability pursuant to RSA 412:3, the school district is also subject to the restrictions set out in RSA 412:3. Therefore, although the school district may not plead immunity as a defense, "liability . . . shall not exceed the limits of coverage specified in the policy . . . or the limit specified in RSA 507-B:4, if applicable, whichever is higher." Because the policy's coverage limit equals the statutory cap, the school district's liability shall not exceed $150,000.

The general liability policy also covered a second risk by providing personal injury coverage up to $1,000,000 to cover the risk of personal injury liability arising from actions that are not covered by the liability limits of RSA chapter 507-B. Because the cause of action in this case is one in which the liability limits of RSA 507-B:4 apply, this coverage is not triggered. Finally, the general liability policy also provided coverage up to $1,000,000 to cover the risk of personal injury liability in case any liability limit of RSA chapter 507-B is found unconstitutional. Unless the liability limits of RSA chapter 507-B are found unconstitutional and therefore do not apply, the condition has not been met and this coverage is not triggered.

The school district's liability for the accident causing Nicholas Marcotte's death is limited by RSA 507-B:4. To protect itself against personal injury liability where RSA 507-B:4 limits such liability, the school district purchased coverage up to $150,000. Because the

conditions for coverage under the endorsements have not occurred, no other coverage under the primary policy applies. Because the extent of coverage purchased by the school district equals the statutory cap, the school district should be liable for damages up to $150,000.

The majority abrogates statutorily created immunity whenever a governmental unit attempts to purchase additional insurance to cover the risk that the statutory protection will not apply. *See Estate of Cargill v. City of Rochester*, 119 N.H. 661, 669, 406 A.2d 704, 708 (1979), *appeal dismissed*, 445 U.S. 921 (1980) (statutory limit constitutional, but precariously close to unreasonable). The statute clearly states the waiver of immunity extends only to "liability on account of a risk so insured against"; the waiver does not extend to uninsured liability. RSA 412:3. By extending the waiver of immunity based on contingent liability, the majority contravenes the intent of not only the legislature, but also the insured and the insurer.

BROCK, C.J., joins in part II of the dissent.