**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| FERMIN VINCENT VALENZUELA; V.V., by and through their Guardian, Patricia Gonzalez, individually and as successors-in-interest of Fermin Vincent Valenzuela, II, deceased; X.V., by and through their Guardian, Patricia Gonzalez, individually and as successors-in-interest of Fermin Vincent Valenzuela, II, deceased, *Plaintiffs-Appellees*, | No. 20-55372 D.C. Nos. 8:17-cv-00278-CJC-DFM 8:17-cv-02094-CJC-DFM |
| v. | ORDER |
| CITY OF ANAHEIM; DANIEL WOLFE; WOOJIN JUN; DANIEL GONZALEZ, *Defendants-Appellants*. | |

Filed March 30, 2022

Before: John B. Owens and Kenneth K. Lee, Circuit Judges, and Michael H. Simon,[*] District Judge.

Order;
Statement by Judge Bea;
Dissent by Judge Collins

---

[*] The Honorable Michael H. Simon, United States District Judge for the District of Oregon, sitting by designation.

**SUMMARY**[**]

**Civil Rights**

The panel denied a petition for panel rehearing and denied on behalf of the court a petition for rehearing en banc in a civil rights action in which the panel affirmed a jury verdict awarding "loss of life" damages to the family of Fermin Valenzuela, Jr., who died after an encounter with the police.

Respecting the denial of rehearing en banc, Judge Bea, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, Bade, Lee, Bress, Bumatay, VanDyke, and joined by Judge Collins as to Parts I and II(A), stated that the panel's holding, that California's prohibition on post-death "hedonic" damage awards was inconsistent with the compensation and deterrence goals of 42 U.S.C. § 1983, was foreclosed by the Supreme Court precedent of *Robertson v. Wegmann*, 436 U.S. 584 (1978); deepened a circuit split that already exists between the Sixth and Seventh Circuits, *compare Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 601-03 (6th Cir. 2006), *with Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 (7th Cir. 1984); relied on an incorrect application of 42 U.S.C. § 1988, which governs damages in § 1983 cases; and conflicted with the tort law schemes of the 44 other states which ban post-death "hedonic" damages.

Dissenting from the denial of rehearing en banc, Judge Collins stated that he agreed with Judge Bea that the panel's decision in this case could not be reconciled with *Robertson*

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*v. Wegmann*, 436 U.S. 584 (1978). Judge Collins also agreed that the panel clearly erred in holding that loss of life damages, a remedy unavailable at common law, was somehow required in § 1983 actions as matter of federal common law under 42 U.S.C. § 1988(a). Judge Collins therefore concurred in Sections I and II(A) of Judge Bea's statement respecting the denial of rehearing en banc, and respectfully dissented from the order denying rehearing en banc.

## COUNSEL

Timothy T. Coates and Peter A. Goldschmidt, Greines Martin Stein & Richland LLP, Los Angeles, California; Steven J. Rothans and Jill Williams, Carpenter Rothans & Dumont LLP, Los Angeles, California; Robert Fabela, City Attorney; Moses W. Johnson, Assistant City Attorney; City Attorney's Office, Anaheim, California; for Defendants-Appellants.

Dale K. Galipo and Hang D. Le, Law Offices of Dale K. Galipo, Woodland Hills, California; John Fattahi, Law Office of John Fattahi, Torrance, California; Garo Mardirossian and Lawrence D. Marks, Mardirossian & Associates Inc., Los Angeles, California; for Plaintiffs-Appellees.

Christopher D. Hu, Horvitz & Levy LLP, San Francisco, California; Steven S. Fleischman and Scott P. Dixler, Horvitz & Levy LLP, Burbank, California; for Amicus Curiae Association of Southern California Defense Counsel.

Steven J. Renick, Manning Kass Ellrod Ramirez Trester LLP, Los Angeles, California, for Amicus Curiae International Municipal Lawyers Association.

---

## ORDER

Judges Owens and Simon have voted to deny the petition for panel rehearing. Judge Owens has voted to deny the petition for rehearing en banc, and Judge Simon so recommends. Judge Lee has voted to grant the petition for panel rehearing and rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**.

Judge Bea's statement respecting the denial of rehearing en banc and Judge Collins' dissent from the denial of rehearing en banc are filed concurrently herewith.

Judge Watford did not participate in the deliberations or vote in this case.

BEA, Circuit Judge, with whom Judges CALLAHAN, IKUTA, BENNETT, R. NELSON, BADE, LEE, BRESS, BUMATAY, and VANDYKE join, and with whom Judge COLLINS joins as to Parts I and II(A), respecting the denial of rehearing en banc:

In *Valenzuela*, a divided panel of our court held that California's prohibition on post-death "hedonic" damages awards,[1] which purportedly compensate the deceased for the pleasure he would have taken from his life had he lived, is inconsistent with the compensation and deterrence goals of 42 U.S.C. § 1983. The court so held despite the $6 million awarded to Valenzuela's estate for his pre-death pain and suffering and the $3.6 million awarded to his family for wrongful death. Indeed, the "hedonic" damages were precisely a repetition of the wrongful death award: another $3.6 million.

The panel's holding is foreclosed by the Supreme Court precedent of *Robertson v. Wegmann*, 436 U.S. 584 (1978) (holding that a state law that totally eliminated a § 1983 claim did not violate the compensation and deterrence goals of § 1983), deepens a circuit split that already exists between the Sixth and Seventh Circuits, *compare Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 601–03 (6th Cir. 2006) (relying on *Robertson* to hold that prohibitions on post-death "hedonic" damages awards are not inconsistent with § 1983 because § 1983 compensates for "actual damages suffered by the victim" and a loss of life is not "actual . . . because it is not consciously experienced by the decedent"), *with Bell v. City of Milwaukee*, 746 F.2d 1205, 1239 (7th Cir. 1984) (holding

---

[1] The word "hedonic" comes from the Greek word for "pleasure." Victor E. Schwartz & Cary Silverman, *Hedonic Damages: The Rapidly Bubbling Cauldron*, 69 Brook. L. Rev. 1037, 1041 (2004).

that a post-death hedonic damages ban was inconsistent with § 1983 because the ban created perverse incentives for police officers to kill rather than injure), relies on an incorrect application of 42 U.S.C. § 1988, which governs damages in § 1983 cases, and conflicts with the tort law schemes of the 44 other states which ban post-death "hedonic" damages. For these reasons, *Valenzuela* should have been given en banc review.

## I.  BACKGROUND

### A.  Post-Death Damages at the Common Law: There Were and Are None.

Over 200 years ago, Lord Ellenborough declared that "[i]n a civil Court, the death of a human being could not be complained of as an injury." *Baker v. Bolton*, 1 Camp. 493, 170 Eng. Rep. 1033 (1808). Indeed, "[n]othing is better settled than, at common law, the right of action for an injury to the person is extinguished by the death of the party injured." *Mich. Cent. R. Co. v. Vreeland*, 227 U.S. 59, 67 (1913). Said another way: *actio personalis moritur cum persona*—a personal right of action dies with the person. *Henshaw v. Miller*, 58 U.S. 212, 213 (1854). The common law simply does not provide a cause of action, either for the victim's estate or the victim's family, against a tortfeasor if the victim dies before a judgment is obtained. It goes without saying that the common law, by failing to provide a cause of action, also fails to compensate the victim's estate and the victim's family for the value of the life the victim would have lived had he survived.

### B.  California's Statutory Scheme

Given the "manifestly unjust," *id.*, consequences of a rule which allowed a tortfeasor to escape all liability if his

wrongful deed resulted in the victim's death before judgment, this common law doctrine has been abrogated by "wrongful death" statutes. England started the trend back in 1846 with Lord Campbell's Act, and every state in the union has followed suit. Restatement (Second) of Torts, § 925 cmt. a. ("In the United States also, the omission of the common law has been corrected in every state by statutes colloquially known as 'wrongful death acts.' Most of these are modeled more or less closely on the English Act."). It was not the evolution of the common law but statutory law which gave rise to this cause of action. The common law did not change.

California, like most states, authorizes two types of civil actions for cases where a victim dies at the hands of his tortfeasor.

First, the executor of the decedent's estate may bring a survival action. Under the state's survival statute, the victim's estate is entitled to recover for the "loss or damage that the decedent sustained or incurred *before* death, including any penalties or punitive or exemplary damages that the decedent would have been able to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Cal. Civ. P. Code § 377.34(a) (emphasis added). These damages can include compensation for lost wages, medical expenses, funeral expenses, or other economic losses.

It is true that California's survival statute limits recovery to economic damages suffered by the victim before death. But while most states allow for pre-death pain and suffering damages, this limitation to pre-death damages is typical. Restatement (Second) of Torts § 925, cmt. a. ("If the defendant's act has caused the death, in most states the survival and revival statutes are interpreted as giving the

representative of the estate no more than the damages accruing before death.").

California's wrongful death statute further authorizes the decedent's family, separate from his estate, to recover "all just damages" incurred by the loss of their loved one. Cal. Civ. P. Code § 377.61. The victim's spouse may bring an action for loss of consortium, which compensates the spouse for "not only the loss of companionship and affection through the time of trial but also for any *future* loss of companionship and affection that is sufficiently certain to occur." *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 799 (Cal. 2010) (emphasis in original). The availability of these damages can result in substantial recovery for the families of victims of police violence, which I discuss below.

After *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1103 (9th Cir. 2014), which followed the same dubious reasoning as *Valenzuela* but goes unchallenged here, the decedent's estate is also entitled to recover for pain and suffering the decedent endured before death in a § 1983 action. The *Valenzuela* majority saw no "meaningful way" to distinguish *Chaudhry*," even though, unlike here, *Chaudhry* focused specifically on pre-death damages. The *Valenzuela* majority then found California tort law inconsistent with the compensation and deterrence purposes of § 1983, despite its making available nearly every conceivable form of just damages.

## C.  Post-Death "Hedonic" Damages

Post-death "hedonic" damages, which purport to compensate a victim for the lost pleasure he would have enjoyed from his life, can include injuries like the lost "ability to enjoy the occupation of your choice, activities of daily living, social leisure activities, and internal well-

being,"[2] or the lost enjoyment of "going on a first date, reading, debating politics, the sense of taste, recreational activities, and family activities."[3]

California permits "hedonic" damages awards in tort cases where the victim survives. *Huff v. Tracey*, 57 Cal. App. 3d 939, 943 (Cal. 1976) ("California case law recognizes, as one component of general damage, physical impairment which limits the plaintiff's capacity to share in the amenities of life . . . No California rule restricts a plaintiff's attorney from arguing this element to a jury.") (internal citations omitted). But it does *not* allow recovery for post-death "hedonic" damages. *Garcia v. Superior Ct.*, 42 Cal. App. 4th 177, 185 (Cal. Ct. App. 1996).

But like the other limitations in its survival statute, California's prohibition on post-death "hedonic" damages is not unique; all but five states prohibit them.[4] And the states that do allow them do so only by statutory enactment, not as a judge-made invention under the common law.

---

[2] Schwartz, *supra* note 1, at 1038.

[3] *Id.* at 1039 (citing *Kansas City S. Ry. Co. v. Johnson*, 798 So. 2d 374, 381 (Miss. 2001)).

[4] The five states are Arkansas (*Durham v. Marbery*, 356 Ark. 491 (Ark. 2004)), Connecticut (*Kiniry v. Danbury Hospital*, 183 Conn. 448 (Conn. 1981)), Hawaii (*Ozaki v. Ass'n of Apartment Owners of Discovery Bay*, 954 P.2d 652 (Haw. Ct. App. 1998)), New Hampshire *(Marcotte v. Timberlane/Hampstead Sch. Dist.*, 143 N.H. 331 (N.H. 1999)), and New Mexico (*Romero v. Byers*, 117 N.M. 422 (N.M. 1994)).

## II.  DISCUSSION

### A.  *Valenzuela*'s Holding is Foreclosed by *Robertson*.

Judge Lee correctly pointed out that our analysis in this case should begin with the Supreme Court's holding in *Robertson*. *Valenzuela*, 6 F.4th at 1104 (Lee, J., dissenting). In *Robertson*, the plaintiff, Clay Shaw, filed a civil rights action under § 1983 in the Eastern District of Louisiana claiming malicious prosecution. Shortly before trial commenced, Shaw died from causes unrelated to the alleged civil rights violation. 436 U.S. at 585. After Shaw's death, the executor of his estate, Edward Wegmann, moved to be substituted as plaintiff. *Id.* at 586. When the district court granted the motion, the defendants responded by moving to dismiss the action on the ground that the action had abated on Shaw's death. *Id.* Under Louisiana law, tort claims survived death only if brought by close relatives. Because Wegmann was not a close relative but a mere executor of Shaw's estate, applying Louisiana law would cause Shaw's § 1983 action to abate. *Id.* at 587–88.

The district court held that the Louisiana law was inconsistent with federal law under § 1988 and denied the defendants' motion to dismiss. *Id.* at 587. The defendants filed an interlocutory appeal to the Fifth Circuit. *Id.* The Fifth Circuit affirmed and found the Louisiana law which caused the action to abate was "inconsistent with the broad remedial purposes embodied in the Civil Rights Acts." *Shaw v. Garrison*, 545 F.2d 980, 983 (5th Cir. 1977) (overruled). The Supreme Court reversed, writing that "despite the broad sweep of § 1983, we can find nothing in the statute or its underlying policies to indicate that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship." *Id.* at 590.

### 1. If a state law causing total abatement of a particular claim is consistent with § 1983, so is a law barring a single category of damages.

The *Valenzuela* majority adopted the same failed position as the Fifth Circuit in *Robertson*, arguing that California's prohibition on post-death "hedonic" damages, "run[s] afoul of § 1983's remedial purpose . . . ." *Valenzuela*, 6 F.4th at 1103. But just as the *Robertson* Court found "nothing in the statute or its underlying policies to indicate that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship," *Robertson*, 436 U.S. at 590, the *Valenzuela* majority has pointed to "nothing in the statute or its underlying policies to indicate that a state law" prohibiting the award of a single category of damages "should be invariably ignored in favor of a rule of" damages maximization. *Id.* Yet that is precisely what the majority held.

*Robertson* found that Louisiana's survival law which entirely abated the § 1983 action was not inconsistent with § 1983 especially in light of the fact that "most Louisiana actions survive the plaintiff's death." *Id.* at 591. Similarly, California's tort damages scheme, as modified by *Chaudhry*, is consistent with § 1983 because it makes available *every* category of damages, *except* post-death "hedonic" damages. It stands to reason that if abatement of an entire cause of action can be not inconsistent with the policy goals of § 1983, a law prohibiting a single category of damages should be not inconsistent as well.

**2.** ***Robertson*** **rejected the majority's point that post-death "hedonic" damages are necessary to incentivize police not to kill.**

The *Valenzuela* majority also argued that California law was inconsistent with the deterrent purpose of § 1983 because it has "the perverse effect of making it more economically advantageous for a defendant to kill rather than injure his victim." *Valenzuela*, 6 F.4th at 1102 (citing *Chaudhry*, 751 F.3d at 1103–04). As a practical and mathematical matter this is not accurate, as discussed below. But more importantly, as a legal matter, the Supreme Court in *Robertson* has already rejected this argument:

> In order to find even a marginal influence on behavior as a result of Louisiana's survivorship provisions, one would have to make the rather farfetched assumptions that a state official had both the desire and the ability deliberately to select as victims only those persons who would die before conclusion of the § 1983 suit . . . and who would not be survived by any close relatives.

*Robertson*, 436 U.S. at 592 n.10. To think that a police officer, when deciding to use deadly force, calculates the difference in exposure of himself and his employer to damages for the victim's pain and suffering versus wrongful death damages arising from the instant death of the victim is necessarily based on the "rather far-fetched assumption" that the policeman had information about the suspect's family and earning potential, and had the *sang-froid*, the cynicism, and the time to calculate the optimal result in damage reduction before he used that force.

### 3. *Robertson* considered and rejected the majority's hypothetical about the victim with no family.

The *Valenzuela* majority also argued that, in the absence of post-death "hedonic" damages, the availability of a wrongful death claim in California is insufficient to bring California's damages scheme in line with the federal law because, "such a framework would still preclude recovery for the decedent who is penniless, without family, and killed immediately on the scene." *Valenzuela*, 6 F.4th at 1103. But the Supreme Court had rejected this argument as well; a zero-recovery result is no basis to disregard state law. *See id.* at 1106 (Lee, J., dissenting) ("[W]e cannot refuse to apply a state law just because it causes abatement of a particular action." (quoting *Robertson*, 436 U.S. at 590–91) (cleaned up)).

Acknowledging that Louisiana's survival law precluded recovery for people without families, the Court went on to say that "surely few persons are not survived by one of these close relatives, and in any event no contention is made here that Louisiana's decision to restrict certain survivorship rights in this manner is an unreasonable one." *Id.* at 592. Indeed, "[t]he reasonableness of Louisiana's approach is suggested by the fact that several federal statutes providing for survival take the same approach . . . ." *Id.* at 592 n.8. Similarly, here, there are no federal statutes which state a possible recovery for post-death "hedonic" damages, and the reasonableness of California's approach is evidenced by the fact that 44 other states prohibit such damages. Confronted with the majority's hypothetical, the Supreme Court was unpersuaded and found no inconsistency between the Louisiana law and the remedial purposes of § 1983, even when total abatement of the family-less and penniless victim's claim was at stake.

### 4. Any limitations in *Robertson*'s holding do not support the panel majority's conclusion.

The opposition to the petition for rehearing en banc downplays the applicability of *Robertson*'s holding because, in that case, the victim's death was not due to his unconstitutionally inflicted injuries.[5]

But the *Robertson* holding left open only the narrow question of "whether *abatement* based on state law could be allowed in a situation in which deprivation of federal rights caused death." *Id*. at 594–95 (emphasis added). The California law at issue does not cause any action to abate— it merely fails to award one item of damages after allowing pre-death economic damages, wrongful death damages, damages for loss of consortium, and now, per *Chaudhry,* pre-death pain and suffering damages.

Furthermore, *Robertson*'s limited holding did not make this court's holding in *Valenzuela* a foregone conclusion. Leaving the question open did not preordain its answer, and the majority opinion fails to explain how *Valenzuela* is meaningfully distinguishable from *Robertson*. Confronted with the facts of *Valenzuela*, in which the family of the victim of the constitutional violations was awarded millions of dollars, it is a stretch to infer that the Supreme Court would have reached a different conclusion than the one it

---

[5] I acknowledge that *Robertson*'s holding is limited: "Our holding today is a narrow one, limited to situations in which no claim is made that state law generally is inhospitable to survival of § 1983 actions and in which the particular application of state survivorship law . . . has no independent adverse effect on the policies underlying § 1983 . . . We intimate no view, moreover, about whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death." *Robertson*, 436 U.S. at 594.

reached in *Robertson*, where the victim's estate went entirely uncompensated.

### 5. *Robertson* is widely applicable.

The Sixth Circuit, relying on *Robertson* has already held that prohibitions on post-death "hedonic" damages are not inconsistent with § 1983 because § 1983 compensates for "actual damages suffered by the victim" and a loss of life is not "actual . . . because it is not consciously experienced by the decedent." *Frontier Ins. Co.*, 454 F.3d at 601–03.[6]

In *Sharbaugh v. Beaudry*, 267 F. Supp. 3d 1326, 1335 (N.D. Fla. 2017), the court held that Florida's prohibition on pre-death pain and suffering damages in wrongful death actions was not inconsistent with § 1983 because "neither § 1983 nor the common law expressly provided for the survival of a personal injury pain and suffering claim after death occurs, and . . . Congress has placed the survival of claims in the legislative hands of the states."

In that case, the plaintiff argued that the lack of pre-death pain and suffering damages would not satisfy the compensation and deterrence goals of § 1983 because the victim, "had a learning disability which limited his earning potential, he had no loss of earnings before his death, he

---

[6] Why the Sixth Circuit's opinion is perfectly consistent with the common law theory of awarding damages only for harms consciously experienced is discussed below. *See infra* Part II(C)(2). However, the Seventh Circuit has reached the opposite conclusion. *See Bell*, 746 F.2d at 1239 (holding that a Wisconsin law precluding post-death "hedonic" damages was inconsistent with § 1983 because it created perverse incentives for police officers to kill rather than injure). If not vacated en banc, the panel majority's opinion here will deepen the circuit split.

permitted his children to be adopted by his father-in-law, and the State of Florida paid for his cremation." *Id.* at 1336.

The court was unpersuaded. Citing *Robertson*, the court correctly noted that the "inquiry under § 1988 . . . is not whether the level of damages that a particular plaintiff will receive in the specific circumstances of one case is inconsistent with the civil rights policies but rather whether *the state law* is inconsistent with federal policies." *Id.* Even if looking at the actual damages awarded to the plaintiff was the relevant inquiry under *Robertson*, in this case, Valenzuela's estate and his family were awarded millions of dollars even without the "hedonic" damages.

## B. California Tort Law is Consistent with the "Broad Remedial Purposes" Which Underlie § 1983.

Consistent with the Supreme Court's decision in *Robertson*, California's ban on post-death "hedonic" damages awards should not be viewed in a vacuum. *Robertson* found that Louisiana's survival law which entirely abated the action was not inconsistent with § 1983 in light of the fact that "most Louisiana actions survive the plaintiff's death." *Id*. at 591. Similarly, here, California's prohibition on post-death "hedonic damages" should be viewed in the context of the other available categories of damages, including damages for pre-death economic losses, wrongful death, loss of consortium, and, as modified by *Chaudhry*, pre-death pain and suffering.

### 1. Unconstitutional police killings do not save money in California.

Not only has the majority's "perverse effect" argument been rejected by the Supreme Court but given the wide availability of damages under California law, there is simply

no evidence that police officers are economically incentivized to kill rather than injure. *Valenzuela*, 6 F.4th at 1102 (citing *Chaudhry*, 751 F.3d at 1103–04). In fact, the facts of *Valenzuela* belie this assertion.

Imagine if Valenzuela's injuries were not fatal and he survived his encounter with police long enough to obtain a judgment at trial. Under California law, plaintiffs are not entitled to a separate pain and suffering instruction and a pre-death "hedonic" damages instruction. *Huff*, 57 Cal. App. 3d. at 944. Thus, in this hypothetical, the jury would have been able to compensate Valenzuela only for his pain and suffering and any economic damages he incurred as a result of the officers' excessive force. Based on what the jury awarded Valenzuela's estate for his pre-death pain and suffering, we can assume this number would be in the ballpark of $6 million. *Valenzuela*, 6 F.4th at 1101 n.4.

If Valenzuela had died prior to trial but the jury had not awarded post-death "hedonic" damages in violation of California law, the jury could have awarded the $6 million for pre-death pain and suffering to Valenzuela's estate *and* the $3.6 million it awarded for wrongful death to the family, for a total of $9.6 million. That is a damages award $3.6 million dollars greater than what Valenzuela would have received had he lived, even without post-death "hedonic" damages. We see that the same is true in *Craig v. Petropulos*, 856 F. App'x 649 (9th Cir. 2021) (unpublished), which was decided at the same time and by the same panel as *Valenzuela*. There, the jury awarded $200,000 in pre-death pain and suffering, $1.4 million for wrongful death, and $1.8 million for post-death loss of life. Even operating under the doubtful assumption that police officers respond to their economic incentives when choosing to apply deadly force, they are still properly incentivized to avoid the use of

deadly force, and thereby avoid an adverse wrongful death award. This is so even without post-death "hedonic" damages added to the equation. The majority's math does not add up.

### 2. The awards, even absent post-death "hedonic" damages, were more than adequate as to deterrence and compensation.[7]

Westlaw has several tools to compare the wrongful death awards that the families in *Valenzuela* and *Craig* received to see whether my claim that wrongful death awards in § 1983 cases are sufficient to satisfy the remedial goals of § 1983 is borne out.

First, take a look at the Westlaw Personal Injury Valuation Handbook. This resource compiles statistics from wrongful death jury trials to create an average, or "basic injury value" for wrongful death claims based on the age, marital status, and number of children of the deceased. This basic injury value can then be adjusted for income. Valenzuela was thirty-two when he died, single, and had two children. Thus, his basic injury value for wrongful death according to the handbook is $1,737,197. However, he had no employment nor salary at the time of his death. Thus, we decrease this base number by 94%, which leaves us with $104,231.82. Someone in the position of Valenzuela's family could hope to recover only $104,231.82 at a jury trial for wrongful death on average. Valenzuela's family was awarded $3.6 million.

---

[7] Neither the plaintiffs in *Valenzuela* nor *Craig* sought *additur* to increase the damages awards; *additur* is available under California law. Cal. Civ. Proc. Code § 662.5.

We see a similar result in *Craig*. Brandon Witt was thirty-nine and single, with no children at the time of his death. It does not appear that evidence of his income or salary was presented at trial, so without adjusting for income, the basic injury value for his wrongful death amounts to $975,000. His parents were awarded $1.4 million for his wrongful death.

And there is no reason to believe that these outcomes are statistical aberrations. Westlaw has another tool, California Jury Verdicts and Settlements, which allows us to compare wrongful death awards in similar cases. In *Estate of Rose v. County of Sacramento*, 2017 WL 5564148 (E.D. Cal. 2017), the parents of an excessive force victim who died by police gunshot received $4.5 million in wrongful death damages. In *Sentell v. City of Long Beach*, 2013 WL 6515430 (C.D. Cal. 2013), the excessive force victim's family received $4.5 million in wrongful death damages. In *Estate of Pickett v. County of San Bernardino*, 2018 WL 10230033 (C.D. Cal. 2018), the excessive force victim's parents were awarded $8.5 million in wrongful death damages.

The availability of other forms of damages, including wrongful death damages, brings California's tort scheme in line with federal law, even in the absence of post-death "hedonic" damages. In *Garcia*, 42 Cal. App. 4th at 185, the California Court of Appeal reached that conclusion when it held that California's prohibition on post-death "hedonic" damages awards was not inconsistent with § 1983 because the availability of punitive damages in survival actions satisfied the compensation and deterrence goals of § 1983.

### 3. The majority's rebuttal is unpersuasive.

The majority opinion in *Valenzuela* offers two counterpoints to explain why the availability of a wrongful

death remedy is not enough to bring California's prohibition on post-death "hedonic" damages in line with federal law. Neither of these arguments are persuasive.

### a.  The victim without family is not before us.

First, the majority argues that California's wrongful death remedy is insufficient to deter police killings because "such a framework would still preclude recovery for the decedent who is penniless, without family, and killed immediately on the scene." *Valenzuela*, 6 F.4th at 1103. But these are not the facts before us. Moreover, this argument was already foreclosed by *Robertson*, which, as discussed above, refused to toss aside state tort law merely because that law resulted in a zero-recovery outcome for that particular plaintiff, even if that plaintiff died with no family.

*Robertson* is not alone among Supreme Court precedents in its rejection of the majority's claim that police officers respond to their economic incentives when deciding to use deadly force. As the Court wrote in *Whitley v. Albers*, 475 U.S. 312, 320 (1986), police officers making decisions "in haste, under pressure, and frequently without the luxury of a second chance" do not stop and evaluate whether the victim in a fast-developing confrontation has family before using deadly force. In the words of Justice Holmes, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 U.S. 335, 343 (1921). Yet the idea that police officers perform this "detached reflection" out of economic self-interest is the dubious assumption upon which *Valenzuela*'s holding rests.[8]

---

[8] Judge Lee's dissent also correctly points out that even in the unlikely event that officers take time to reflect on their economic

### b. Post-death "hedonic" damages do not compensate the victim.

The majority also dismissed out of hand the possibility that California's wrongful death claim brings California's statutory scheme in line with § 1983 simply because the wrongful death award "address[es] different injuries." *Valenzuela*, 6 F. 4th at 1103. Really? If the wrongful death award and the post-death "hedonic" damages award are for "different injuries," why then do the two awards in *Valenzuela* match to the penny? Much more likely than attempting to speculate how the elements of one award might differ in economic value from those of the other is the likelihood that the jury simply doubled the awards for Valenzuela's death: $3.6 million and $3.6 million for each of the divorced Valenzuela's two children.

This assumption is borne out by the closing arguments. Valenzuela's attorney did not argue that the jury should award a specific amount for Valenzuela's loss of life to his estate and a specific amount for wrongful death to the children separately. Instead, he repeatedly stated that all damages were to compensate Valenzuela's children:

---

incentives before deploying deadly force, most are not personally liable for the damages awards they incur. *Valenzuela*, 6 F.4th at 1108 ("[E]ven the most malevolent officer would not kill a suspect because it would be 'economically advantageous.' Almost all police officers today do not face any personal financial liability because the government generally indemnifies them. The real deterrents to police misconduct are not monetary damages (which they do not personally pay anyway), but firings, negative media attention, and potential criminal liability.") (Lee, J., dissenting) (footnote omitted). Of course, neither of the *Valenzuela* nor *Craig* juries found the officers were "malevolent," since punitive damages were not awarded against them.

> So I know it sounds a little confusing because you're talking about the pain and suffering for someone who has died already and his loss of life, but under the Fourth Amendment, because you found excessive or unreasonable force, those are damages that are recoverable by law and they go to the children. Those damages go to the children.

This point was driven home by the court's own jury instructions: "Ladies and gentlemen, I just want to be clear . . . You must award only the damages that fairly compensate the children for their loss."

Instead of the jury performing a separate calculation for the lost pleasure of Valenzuela's life, Valenzuela's children enjoyed double recovery for their wrongful death damages.[9] Rather than "compensation," this double counting seems like over-compensation, especially since § 1983 also provides for an award of attorney's fees.[10]

Just because the wrongful death claim compensates the family of the victim instead of the victim's estate (and thus, possible creditors) does not mean that the wrongful death claim by itself cannot satisfy the deterrent purpose of § 1983. What matters for deterrence is the size of the damages award, not the person to whom the award is paid. As for compensation, *Robertson* already held that compensating the victim's estate does not serve the compensation goal of

---

[9] The two awards for the death of Brandon Witt are only slightly more disguised: his two parents were awarded post-death "hedonic" damages of $1.4 million and wrongful death damages of $1.8 million.

[10] The prevailing party in a § 1983 action is entitled to attorney's fees under 42 U.S.C. § 1988(b).

§ 1983 anyway, as those awards are always enjoyed by the beneficiaries of the victim's estate, and not the victim of the unconstitutional violation himself. *Robertson*, 436 U.S. at 592.**[11]**

The size of the wrongful death damages awarded to the families of the victims in *Valenzuela* and *Craig* demonstrate why California's prohibition on post-death "hedonic" damages is not inconsistent with the compensation and deterrence goals of § 1983. And the majority's only response to this point rests on flawed assumptions about how police officers respond during emergencies and who is ultimately responsible for paying out these multi-million-dollar damages awards. The majority would toss aside a robust state tort law scheme for failure to achieve the unenumerated policy goals of § 1983 based on a hypothetical which strains credulity and then replace that state law with a rule which, as the numbers show, does not do a better job of serving those goals.

## C. Post-death "hedonic" damages are contrary to the common law of torts.

It is not the role of this court to decide whether post-death "hedonic" damages are a good idea as a policy matter. California, one of the most plaintiff-friendly of jurisdictions, has already decided to prohibit them—along with 44 other states. But there is good reason *not* to second guess California's choice. Post-death "hedonic" damages contravene traditional tort law liability rules and cannot be reliably calculated.

---

**[11]** Why *Robertson*'s analysis on this point is consistent with traditional tort law rules I discuss below. *See infra* Part II(C)(1).

1.  **Post-death "hedonic" damages do not compensate the victim of the unconstitutional injury.**

"[T]he law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." Restatement (Second) of Torts, § 901, cmt. a. Because post-death "hedonic" damages are not awarded to the victim of the tort but are awarded only after the victim has died, the award is always enjoyed by the decedent's estate. Awards that go to the decedent's estate are never able to restore the decedent to his prior position of being alive nor do they provide substitute compensation to the victim.

Indeed, because post-death "hedonic" damages are awarded to the estate of the victim, and not the victim's relatives, that award would be distributed pursuant to California's probate code, which pays the estate's creditors before the estate's heirs. Cal. Prob. Code § 11640(a). If the award does end up with the victim's family, now the family enjoys double-recovery, as they can also receive damages for the loss of their loved one via a wrongful death action.

According to *Robertson*, compensating the estate of the victim of the constitutional violation does not serve the compensation goal of § 1983. "The goal of compensating those injured by a deprivation of rights provides no basis for requiring compensation of one who is merely suing as the executor of the deceased's estate." *Robertson*, 436 U.S. at 592.

Because the compensation purpose of § 1983 is to compensate the victim of the constitutional violation, and not the victim's family, the rule offered by the *Valenzuela* majority does nothing to serve § 1983's compensation goal, as post-death "hedonic" damages will always be enjoyed by

the beneficiaries of the victim's estate—some of whom may be creditors, or non-family legatees—and not the victim himself. *Robertson* dictates that compensating the victim's estate is irrelevant in determining whether a state law is consistent with the compensation goal of § 1983.

### 2. Post-death "hedonic" damages evade the cognitive awareness requirement of tort law.

Failing to compensate the victim of the unconstitutional injury is not the only problem with post-death "hedonic" damages. They also create an "end-run" around traditional tort liability rules which require the victim to have "'cognitive awareness' of his or her loss to ensure that he or she receives compensation only for the injuries actually suffered.'"[12] This is the same conclusion the Sixth Circuit reached when it upheld Michigan's ban on post-death "hedonic damages" as not inconsistent with § 1983. *Frontier Ins. Co.*, 454 F.3d at 601–03.

Whether a victim was cognitively aware of the lost pleasure of the life he would have lived, while perhaps an interesting spiritual or metaphysical question, seems difficult to prove by a preponderance of the evidence. This is especially so in cases involving police encounters in suspected crime cases which typically, as in *Valenzuela* and *Craig*, develop and end quite quickly.

---

[12] Schwartz, *supra* note 1, at 1045.

### 3. Post-death "hedonic" damages are speculative and expert attempts to quantify them are inadmissible.

Tort damages should be calculated "with as much certainty as the nature of the tort and the circumstances permit." Restatement (Second) of Torts § 912 (1979). Indeed, "chief significance attaches to the nebulous but universally accepted rule which proscribes uncertain or speculative damages. In some cases, it prevents any substantial recovery, though it is clear that serious harm has been suffered." Restatement (First) of Torts, § 944 cmt. c.

Post-death "hedonic" damages are difficult to calculate and largely speculative. In contrast, in a wrongful death action, courts use evidence of the decedent's earning capacity to calculate a fair award. As to pre-death pain and suffering, the jury can use its own experience with pain and suffering.[13] But how does a jury put a number on the pleasure the particular decedent would have enjoyed from life had it not been cut short?

The plaintiff's bar has attempted to use expert economist testimony to fill this analytical gap. But after *Daubert*,[14]

---

[13] Indeed, "[o]ne of the most difficult tasks imposed on a fact finder is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. The inquiry is inherently subjective and not easily amenable to concrete measurement." *Pearl v. City of Los Angeles*, 36 Cal. App. 5th 475, 491 (Cal. App. 2019). California's model jury instructions for non-economic damages in a tort case provide: "No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense." Judicial Council of California Civil Jury Instructions 3905(A)(2022).

[14] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

these expert opinions are often excluded for failing to meet the requirements of Federal Rule of Evidence 702. The Journal of Legal Economics has observed that "[t]he primary trend in federal cases has been continuing rejection of hedonic damages testimony . . . There still has never been a reported federal decision decided under *Daubert* in which a trial court permitted hedonic damages testimony involving specific dollar values for the plaintiff."[15] As of 2018, this trend has changed little, apart from a single unpublished district court order denying a defendant's motion to exclude hedonic damages expert testimony.[16]

"Attempts to quantify the value of human life have met considerable criticism in the literature of economics as well as in the federal court system. Troubled by the disparity of results reached in published value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such damages inadmissible." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245 (10th Cir. 2000) (collecting cases).

Experts attempt to quantify post-death "hedonic" damages by using several approaches. First is "willingness to pay." Experts compare "(1) consumer willingness to purchase safety devices; (2) worker willingness to accept higher compensation for a greater risk of death; and (3) the

---

[15] Thomas R. Ireland, *Trends in Legal Decisions Involving Hedonic Damages From 2000–2012*, 19 J.L. & Econ 61, 63 (2012).

[16] Thomas R. Ireland, *Legal Decisions Involving Hedonic Damages From January 2013-February 2018*, 24 J.L. & Econ 51, 53 (2018) (citing *Farring v. Hartford Fire Ins. Co.*, 2014 WL 12770120 (D. Nev. 2014) (unpublished).

government's willingness to impose safety violations." [17] "For instance, assume that an optional driver's side air bag costs $500, and that this air bag reduces the chance of death in an accident from six in 10,000 down to two in 10,000. Reducing the chance of dying by four in 10,000, or one chance in 2,500 at a cost of $500 suggests, according to this theory, that the consumers place a value of $1,250,000 (2,500 x $500) on their lives."[18]

The second method is called the "individual avoidance" approach, which is

> based on the theory that workers will demand higher wages in jobs with a greater risk of death . . . For example, consider a twenty-five-year-old college graduate earning forty thousand dollars a year who works as a salesperson – an occupation with a negligible work-related risk of death. Suppose that now he is offered a different job, with a one in 10,000 annual risk of death . . . If the individual is willing to accept a job with a one in 10,000 chance of death for an additional $5,000 in salary, then it would stand to reason, according to this theory, that he or she would accept certain death for 10,000 times this amount, or $50,000,000 dollars.[19]

---

[17] Schwartz, *supra* note 1, at 1061–1062.

[18] *Id.* at 1062.

[19] *Id.* at 1062–63.

The third method is

> based on the cost-benefit analysis conducted by government agencies in deciding whether to adopt a safety regulation . . . According to Dr. Smith [one of the nation's leading experts in hedonic damages], most of these government studies "show a willingness to implement legislation at a cost of approximately two million dollars per life saved; very little legislation beyond three million."[20]

"Hedonic" damages experts use one of these three methodologies to establish a base number for the value of human life, and then employ a "loss of pleasure of life scale" to determine the extent of the damages, ranging from "minimal" to "catastrophic," as would be the case in a post-death "hedonic" damages award, where the victim's life is entirely lost.[21]

As one can imagine, these methodologies are rife with flaws. Many of the lowest-paying jobs are also the most dangerous. Human life valuations by the government are used to weigh the relative costs and benefits of preventing small risks of death (like plane crashes and automobile accidents) over large population groups—these calculations are not used to compensate individual and idiosyncratic

---

[20] *Id.* at 1063.

[21] *Id.*

plaintiffs.[22] Moreover, asking jurors to determine "the amount that the victim would have paid to avoid the risk" to determine the value of his lost life does not take into account the victim's individual risk tolerance, and also suffers from immense hindsight bias.[23] As the California Court of Appeal put it in *Loth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 768 (Cal. Ct. App. 1998), these "baseline calculations have nothing to do with [a] particular plaintiff's injuries, condition, hobbies, skills, or other factors relevant to her loss of enjoyment of life." The Seventh Circuit, in *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992), upholding a district court's decision to exclude expert testimony on "hedonic" damages, wrote the following:

> [W]e have serious doubts about [the] assertion that the studies [relied] upon actually measure how much Americans value life. For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a

---

[22] W. Kip Viscusi, *The Flawed Hedonic Damages Measure of Compensation for Wrongful Death and Personal Injury*, 20(2) J. Forensic Econ. 113, 117 (2007).

[23] *Id.* at 127–28.

consumer's willingness to pay to reduce *risk*, perhaps more a measure of how cautious a person is than how much he or she values life. Few of us, when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking." Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we buy an airbag is not immediately obvious.

If "hedonic" damages are difficult to calculate reliably when jurors can hear the testimony of a living victim, these methodological issues are exacerbated when the victim cannot take the stand, and experts, friends, and family are forced to speculate as to how much pleasure the victim would have taken in his remaining years of life.

## D.  The Majority Misapplied the Text of § 1988.

By upholding the awards of post-death "hedonic" damages in *Valenzuela,* the majority misapplied the text of § 1988 to award a form of damages not available under applicable (California) state law or the common law.

Section 1988 instructs courts to award damages in accordance with "the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988(a). Thus, § 1988 indicates a two-step process. First, the federal court determines the common law as modified by the state constitution and statutes of the applicable state. Second, the court decides whether that state law is inconsistent with the Constitution and laws of the United States.

Performing the first step, the *Valenzuela* majority properly identified the relevant state law: California Civil Code § 377.34, which allows for § 1983 claims to survive but limits damages to those the "decedent sustained or incurred before death." The majority then moved on to the second step and, while I disagree with the conclusion it reached, analyzed whether California law was consistent with the policies which underlie the federal law.[24]

After steps one and two are completed, "section 1988 runs out of gas." *Dobson v. Camden*, 705 F.2d 759, 766 (5th Cir. 1983). If the state law is consistent with federal law, it is simple enough to apply it. But if federal law fails to provide the desired remedy, and the state remedy is inconsistent with the federal law, what law of damages should be applied? The only plausible course of action supported by the text of the § 1988 statute would be to apply the "Constitution and laws of the United States."

Of course, nothing in the Constitution or its amendments deals with the availability of damages caused by deprivation of rights by state actors.

And "the laws of the United States" are no more fruitful. To the extent that the "laws of the United States" refers to federal law as enacted by Congress, there is not a single federal statute awarding post-death "hedonic" damages. That includes § 1983, which does not provide a damages

---

[24] While this concept is unsupported by the text of § 1988, we are bound by precedent which states that in determining whether the state law is consistent with the laws of the United States, we also look to "the policies expressed in them." *Robertson*, 436 U.S. at 585 (1978). In the case of § 1983, those policies include "compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Id.*

remedy at all. To the extent that "the laws of the United States" refers to precedent from the United States Supreme Court, I can find no decision which awards post-death "hedonic" damages. As noted, there is no Ninth Circuit precedent to follow and the other circuits are split.

Supreme Court precedent instructs the lower federal courts in § 1983 cases to look to the common law.[25] But as discussed at perhaps too much length above, the common law did not and does not allow for any recovery in tort after the death of the victim—let alone recovery for post-death "hedonic" damages. The common law as practiced in the fifty states similarly prohibits post-death "hedonic" damages. Recall that only five states allow them, all by statutory enactment, not their judge-developed common law.

Here, had the *Valenzuela* majority properly applied § 1988 and looked to the Constitution, the laws of the United States, or the common law to find the applicable law of damages, it would have applied the common law and would have had no legal basis to uphold the post-death "hedonic" damages awards in *Valenzuela* and *Craig*.

## III.  CONCLUSION

Post-death "hedonic" damages awards are speculative, contravene traditional common law damages principles, contradict California state law, and where, as here, the awards would have been $9.6 million and $1.6 million

---

[25] *See Carey v. Piphus*, 435 U.S. 247, 257 (1978) ("[O]ver the centuries the common law of torts has developed a set of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well.").

respectively in *Valenzuela* and *Craig* without post-death "hedonic" damages, are not necessary to satisfy the policy goals of § 1983 under Supreme Court precedent. For these reasons, our court should have ordered a review of the two cases by an en banc panel.

---

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

I agree with Judge Bea that the panel's decision in this case cannot be reconciled with *Robertson v. Wegmann*, 436 U.S. 584 (1978). I also agree that the panel clearly erred in holding that loss of life damages, a remedy unavailable at common law, is somehow required in § 1983 actions as matter of federal common law under 42 U.S.C. § 1988(a). I therefore concur in Sections I and II(A) of Judge Bea's statement respecting the denial of rehearing en banc, and I respectfully dissent from today's order denying rehearing en banc.